PAPER PRODUCTS MACHINE COMPANY *vs.* SAFEPACK MILLS.

Suffolk.    March 16, 1921. — June 1, 1921.

Present: RUGG, C. J., BRALEY, PIERCE, CARROLL, & JENNEY, JJ.

*Contract,* Assignability.    *Assignment.*

By a contract in writing made in June, 1917, between an inventor and a manufacturer, the inventor granted to the manufacturer a license to build, have built, use and operate machines, covered by certain letters patent granted to him in 1916 and 1917 and by further letters patent to be granted upon improvements upon the machines, during the terms of the letters patent, and the exclusive right and license to sell their product in North and South America, and agreed that, when requested, he would "give to the corporation and its representatives such advice respecting the mode of use of the patented machines and all processes connected with the manufacture of reenforced paper upon said machines as may be necessary to enable it to use said machines and any improvements thereof to the best advantage;" and the manufacturer agreed to pay to the inventor "as rent or royalty" a certain percentage of the net profits from sales of the goods manufactured by machines subject to the letters patent, payments out of profits to be made quarterly, inventories and balances to be "settled in full semi-annually, during the term of the license," and that at all. times the manufacturer would use his "best efforts to promote and increase the advantageous sale of the products of the patented machines and to increase and develop the business which it is hereby licensed to carry on, and to secure to the owners the greatest benefits from said inventions and patents;" and it was stated in the contract that it was "the intention that both parties hereto shall in all matters co-operate to improve and increase the business to be carried on hereunder, to their mutual advantage." *Held,* that by the contract a relation of trust and confidence was created between the parties by the agreement of the inventor to advise the manufacturer during the term of the patent respecting the mode of the use of the patented machines and all processes connected with their product.

In August, 1917, the inventor, in the circumstances above described, made in writing to a third party an assignment of all his rights under the letters patent and inventions and improvements therein subject "to the license granted" to the manufacturer in June, 1917, " to manufacture and sell the product of the patented machines in North and South America," without further description of his contract with the manufacturer; and also of "all the rentals, royalties, profits and moneys that shall or may become due and payable " from the manufacturer " or from any other party under and by virtue of said license agreement," and granted to the assignee "full power and authority to avail " himself "of any and all rights and remedies reserved . . . or existing . . . under said license agreement, and to take any and all proceedings for the enforcement of the rights hereby assigned," in the inventor's " name if need be, but for the benefit of " the assignee. *Held,* that

(1) The assignment gave to the assignee no right to maintain against the manufacturer an action for an alleged breach by him of the contract above described in procuring from another inventor a right to use a patented machine of the other inventor and, by using it, destroying the market for the product of the machines covered by the contract;

(2) The assignment gave to the assignee no right to maintain against the manufacturer an action, begun in December, 1919, for the percentage, stipulated in the contract between the inventor and the manufacturer, of net profits which had accrued from sales of products of the machines between October, 1918, and May, 1919. *American Lithographic Co.* v. *Ziegler,* 216 Mass. 287, distinguished.

A contract which involves personal services and is one of trust and confidence cannot be assigned in part and continue to abide in the original parties to it in part.

CONTRACT, with a declaration in two counts described in the opinion. Writ dated December 1, 1919.

Material portions of the contract in writing, referred to in the opinion, dated June 30, 1917, between Jackson and Howard, described in the contract as "owners" and parties of the first part, and the defendant, described as the "corporation," were that the parties of the first part owned certain inventions for machines for which six letters patent of the United States and three of the Dominion of Canada had been granted in 1916 and 1917, and that they had made applications for letters patent upon certain improvements in the machines; that the corporation desired to obtain and the owners had agreed to grant a license to operate the patented machines and to manufacture and sell the product thereof in North and South America to the extent and upon the terms and subject to the restrictions set forth therein; that the owners agreed to sell and the corporation to purchase for $5,000 in cash two specified machines; that the owners would make or superintend the making of such changes in the machine "as they

think necessary to enable it to operate at the greatest efficiency, and the expense of such changes shall be borne by the corporation; provided, however, that if said changes shall entail an expense exceeding $2,000, the excess above $2,000 shall be paid by the owners." The contract then continues:

"The owners will use their best endeavors to render said machine capable of producing one hundred feet or more of material per minute; but this shall not be considered as a covenant or assurance on the part of the owners that said machine shall attain any definite degree or speed of operation or capacity of output.

" (3) The owners hereby grant to the corporation for the rent or royalty hereinafter specified, a license for the term of said patents issued and to be issued, to build, have built, use and operate the patented machines, and the exclusive right and license to sell the product thereof in North and South America, (but not elsewhere without the written consent of the owners in each case first obtained) to such persons, for such prices, and upon such terms as the corporation may see fit, subject only to the obligations and requirements herein contained.

" (4) The owners further agree that they will promptly apply for letters patent of the United States and Canada for all improvements to said machine that may be invented or acquired by them or either of them, and all patents so obtained shall be included in the license herein given, the expense of procuring all such patents to be borne by the owners and the patents to be their property.

" (5) The owners will not during the term of this license sell machines built under said patents to any other persons or corporations, to be used in the manufacture of reenforced paper to be sold in North and South America, nor license any other person or corporation to build, sell, or otherwise use said machines to manufacture reenforced paper to be sold in North and South America. But this shall not be deemed to limit the right of the owners to build, have built, use and operate the patented machines and any improvements thereof, and licensing others to do so, in any place, and from selling and licensing others to sell the product thereof in any place or places outside North and South America, it being intended that the exclusive right of sale hereby given shall be confined to the continents of North and South America.

" (6) The corporation may, with the written consent of the owners, grant sublicenses to any persons, companies or corporations to build, use and operate the patented machines and any improvements thereof, and to sell the product thereof in North and South America. The owners will not withhold their consent to any sublicense proposed by the corporation, except for good reason; it being the intention that both parties hereto shall in all matters co-operate to improve and increase the business to be carried on hereunder, to their mutual advantage.

" (7) The corporation shall pay to the owners as rent or royalty fifty per cent (50 %) of the net profits from sales of the goods manufactured by machines which are the subject of the enumerated patents and any improvements thereof. Payments to the owners out of profits earned shall be made quarterly; and inventories shall be made and all balances due the owners shall be settled in full semi-annually, during the term of the license. The corporation shall keep separate books or accounts of the business done under this license, which shall be open at any reasonable time to inspection by the owners or their attorney. It shall permit an examination of said business at any reasonable time by a certified public accountant or auditor employed by the owners, the expense of such audit to be borne by the owners. It shall render monthly statements to the owners in form satisfactory to them and accompanied by proper vouchers, showing the goods manufactured and sold under said patents and showing in detail the cost of labor, materials and any other charges and expenses incident to manufacture and sale, and such further particulars concerning the business as the owners may reasonably request.

" (8) The corporation shall at all times use its best efforts to promote and increase the advantageous sale of the products of the patented machines and to increase and develop the business which it is hereby licensed to carry on, and to secure to the owners the greatest benefits from said inventions and patents. It shall not at any time dispute the novelty of the patented inventions, or validity of any of the patents.

" (9) The owners will, when requested, give to the corporation and its representatives such advice respecting the mode of use of the patented machines and all processes connected with the manufacture of reenforced paper upon said machines as may

be necessary to enable it to use said machines and any improvements thereof to the best advantage.

"(10) In case of infringement of said patents issued or to be issued, or any of them, proceedings for injunction shall be taken if both parties deem it advisable, the expense to be considered as an expense of the business under this license, and any profits or damages recovered to be treated as profits of the business and accounted for accordingly. If the parties do not agree as to the expediency of such proceedings, either party may institute such proceedings as they or it see fit, the expense in such case to be borne by the party instituting the proceedings, and the damages or profits recovered to be the property of such party. Should any claims of infringement be made against the corporation, the corporation shall defend the same, the expense and any amounts recovered as damages or otherwise to be treated as an expense of the business. Such defence shall be in charge of the corporation; provided, however, that the owners may retain counsel at their own expense to participate in the proceedings; and if the defence is not properly conducted, the owners may assume full charge and control thereof.

"(11) In the event that the corporation shall be adjudicated bankrupt or insolvent, or if a receiver be appointed over its property in any proceedings by creditors or others, this license may be terminated then or thereafter by the owners at their option, and in case of such termination all rights of the corporation hereunder shall cease, and any sublicenses that may have been given shall revert to the owners."

The assignment by Jackson and Howard to the plaintiff was dated August 27, 1917, and was of their "whole and entire right, title and interest in and to those letters patent and to those applications for letters patent [by description of numbers] . . ., and all our right, title and interest in and to the inventions and improvements which are the subject thereof." And the instrument continued:

"The same to be held and enjoyed by the said Paper Products Machine Company and its successors and assigns, to the full end of the terms for which said patents have been or may be granted.

"Subject, however, to the license granted by us on June 30, 1917, to the Safe Pack Paper Mills to manufacture and sell the product of the patented machines in North and South America.

"And for the consideration aforesaid, we do hereby assign, transfer and set over to said Paper Products Machine Company all the rentals, royalties, profits and moneys that shall or may become due and payable to us, or to which we may become entitled, from Safe Pack Paper Mills or from any other party under and by virtue of said license agreement (not including, however, the sum of $5,000 paid to us for two machines sold to Safe Pack Paper Mills and described in the first paragraph of said license agreement).

"To have and to hold the same to the said Paper Products Machine Company and its successors and assigns to its and their own use and behoof forever.

"And we do further give and grant to said Paper Products Machine Company full power and authority to avail itself of any and all rights and remedies reserved to or existing in us under said license agreement, and to take any and all proceedings for the enforcement of the rights hereby assigned, in our name if need be, but for the benefit of said corporation, without expense to us, it being the intention that all measures for the protection and enforcement of the interests hereby assigned may be available to the Paper Products Machine Company as fully and effectually as they would have been to us had this assignment not been made.

"And the Paper Products Machine Company by the acceptance of this assignment and in consideration thereof, hereby agrees for itself and its successors and assigns that it will not sell the product of the patented machines in North and South America during the term of said license to the Safe Pack Paper Mills, and that in any sale or lease of machines built under said patents or in granting any license to others to manufacture under said patents it shall restrict the sale of the products thereof to places elsewhere than on the continents of North and South America. And it further assumes the obligation of the assignors to pay the cost in excess of two thousand dollars ($2,000), if any such there be, incurred for alterations of the machines as described in paragraph two of said license agreement."

The defendant was permitted to file a demurrer late under the conditions described in the opinion. The demurrer was heard by *Wait*, J., and was overruled. The judge then, being of opinion

that the order overruling the demurrer ought to be determined by this court before any further proceedings, reported the case for that purpose.

*W. G. Thompson,* (*S. Gottlieb* with him,) for the defendant.

*J. Noble,* (*E. A. McLaughlin, Jr.,* with him,) for the plaintiff.

PIERCE, J.   This is an action of contract under an agreement in writing granting to the defendant an exclusive license to operate certain patented machines and to manufacture and sell the product thereof in North and South America for the term of the patents issued to, and to be issued upon the application of, the licensors.   The plaintiff is a corporation to which the licensors on August 27, 1917, sold, assigned and transferred the letters patent and their right, title and interest in the letters patent and applications for letters patent, for the full end of the terms for which said patents have been or may be granted, "Subject, however, to the license granted by us on June 30, 1917, to the Safe Pack Paper Mills [the defendant] to manufacture and sell the product of the patented machines in North and South America."   On the same day by the same instrument the licensors also assigned, transferred and set over to the plaintiff "all the rentals, royalties, profits and moneys that shall or may become due and payable to us, or to which we may become entitled, from Safe Pack Paper Mills or from any other party under and by virtue of said license agreement. . . ."   It is to be noted that the instrument of assignment and transfer to the plaintiff makes no mention of any instrument governing the reciprocal contractual rights and obligations of the licensors and licensee, and the plaintiff and the defendant are in agreement that the assignment did not in terms transfer the contract between the licensors and licensee, did not delegate the undertakings of the licensors to the plaintiff, and did not relieve the licensors from their obligations to the defendant.

The declaration is in two counts.   The first count alleges the breach of the contractual undertaking of the defendant, as set out in the written agreement annexed to the declaration, to "use its best efforts to promote and increase the advantageous sale of the products of the patented machines and to increase and develop the business which it was licensed to carry on, and to secure to said Jackson and Howard [the licensors] the greatest benefits from said inventions and patents;" and assigns as the particular

breach of the undertaking that the defendant procured of one Wandel the right to use a patented machine, which the defendant set up in place of the machine of the licensors, and at less expense substituted its product for that of the machine of the licensors, and thereby purposely destroyed the market for the material produced by the licensors' machine.

By the second count the plaintiff alleges its right under its purchase and the assignment from Jackson and Howard, the licensors, "to all rentals, royalties, profits and moneys that should or might become due or payable to Jackson and Howard or to which they might become entitled from the defendant under and by virtue of said license contract." The plaintiff further alleges that the defendant operated the machine of the licensors between October, 1918, and May, 1919, and that the product of that machine was sold by the defendant at a net profit, "one half of which the defendant was bound under the license contract to pay to the plaintiff as rent or royalty."

The defendant, after the filing of an answer, was allowed by the court to raise the question of law set out in a proposed demurrer annexed to a motion to withdraw its answer, "on condition that the demurrer is to be treated as though embodied in the answer filed on January 23, 1920." We assume the imposed condition is intended to restrict "the questions of law" to matters of substance and to exclude from discussion and decision matters of form. Putting to one side formal questions of law as obnoxious to the condition imposed by the court, we have remaining, applicable to both counts of the declaration, the substantial assignment of the demurrer that the contract was not assignable as a whole or in respect to any accrued rights thereunder.

The contention of the defendant that the contract was not assignable has as its basis the fact that under the contract of license, the licensors and owners of the patents and of the machines built under them agreed "when requested, [to] give to the corporation [the defendant] and its representatives such advice respecting the mode of use of the patented machines and all processes connected with the manufacture of reenforced paper upon said machines as may be necessary to enable it to use said machines and any improvements thereof to the best advantage." It contends that a relation of trust and confidence between the

licensors and the defendant was created by the above quoted provision, and by the further provision of the contract that it is the "intention that both parties hereto shall in all matters co-operate to improve and increase the business to be carried on hereunder, to their mutual advantage."

Assuming the existence of the relation of trust and confidence, the defendant invokes as its defence the well established rule that "when rights arising out of contract are coupled with obligations to be performed by the contractor, and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned without the consent of the other parties to the original contract." Gray, J., in *Delaware County Commissioners* v. *Diebold Safe & Lock Co.* 133 U. S. 473, 488. We think the facts in the case at bar are consistent only with the proposition that a relation of trust and confidence was created between the parties by the agreement of the patentors to advise the licensee during the term of the patents respecting the mode of the use of the patented machines and of all processes connected with the product of such machines. *New England Cabinet Works* v. *Morris*, 226 Mass. 246.

To the position of the defendant that the contract was not assignable because it was not intended to be assigned, and because as a matter of law, whatever the intention, it could not be assigned, the plaintiff by way of reply and as a statement of its position asks the court "to observe that the assignment did not purport to transfer the contract or to delegate these undertakings to the plaintiff corporation or relieve the licensors from responsibility for them; and, when the undertakings were in fact later performed, the assignee's right to the consideration was complete. . . . The royalties to be paid by the defendant, and all rights and remedies for the protection of the patents and enforcement of the rights of the former owners against the licensee, all these things were legally assignable. Their assignability was not affected by the fact that something remained to be done by the assignors, at the time of the assignment, if it was in fact done by the assignors later and before action brought." The argument of the plaintiff manifestly only covers a contract which has been fully

performed by the assignor, with a consequent duty on the other party to the contract to pay to the assignor the debt which was thereby created. In such a situation the personal element has disappeared, and no reason is perceived why the right to receive the debt may not be assigned. The facts admitted by the defendants in *American Lithographic Co.* v. *Ziegler*, 216 Mass. 287, at page 288, distinguish that case from the case at bar.

It is plain that the right to maintain an action for the breach assigned in the first count is a right which is not separable from the contract; that contract was not assignable, and the plaintiff has no right to an action for the defendant's non-performance in its own right and name or in the name and right of the licensors.

Nor do we think the plaintiff has a standing to maintain its action under the allegations of the second count. The license agreement is still executory, the licensors remaining bound by its terms to personal services during the terms of the existing patents and of the pending applications for patents.

We also are of opinion that a contract which involves personal services, and is one of trust and confidence, cannot be assigned in part and abide in the original parties to it in part.

The demurrer in each count should have been sustained.

*Demurrer sustained.*