### WETHERELL BROS. CO. v. UNITED STATES STEEL CO.

Civ. A. 51–368.

United States District Court
D. Massachusetts.

May 15, 1952.

Stuart DeBard, Boston, Mass., for plaintiff.

Charles C. Cabot, Herrick, Smith, Donald, Farley & Ketchum and Thaddeus R. Beal, all of Boston, Mass., for defendant.

McCARTHY, District Judge.

This is a civil action brought by the plaintiff, Wetherell Bros. Co., a corporation organized and existing under the laws of the Commonwealth of Pennsylvania; against the defendant which is a corporation organized under the laws of the state of New Jersey.

Under date of May 1, 1923 the Morris & Bailey Division of the Oliver Iron & Steel Corporation of Pittsburgh, Pennsylvania, entered into a written contract with Wetherell Brothers Company, a Massachussetts corporation (hereinafter sometimes referred to as "Wetherell-Massachusetts") by which the Morris & Bailey Division appointed Wetherell-Massachusetts exclusive selling agents in the New England states for the sale of cold rolled steel strips. All orders taken by Wetherell-Massachusetts were subject to the approval of Morris & Bailey Division for acceptance. Morris & Bailey Division agreed to pay Wetherell-Massachusetts a commission of 5% on orders obtained by Wetherell-Massachusetts. Wetherell-Massachusetts agreed to use its best endeavors to secure business in the New England territory and to cover the same thoroughly in all respects. A correct copy of the contract is attached to the complaint.

On June 2, 1930 the defendant purchased the plant, property and business of the Morris & Bailey Division of Oliver Iron & Steel Corporation.

On June 7, 1930, duly authorized representatives of Wetherell-Massachusetts met in New York City with duly authorized representatives of the defendant and negotiated a contract, which later that day was reduced to writing and executed by representatives of Wetherell-Massachusetts in New York City and was later executed by representatives of the defendant.

By this contract it was agreed between the defendant and Wetherell-Massachusetts that the defendant would assume all of the obligations of Oliver Iron & Steel Corporation imposed upon it by the contract of May 1, 1923, and the terms of that contract were confirmed except that the provision in the old contract that either party could terminate it upon six months' notice was changed so that either party could terminate upon two years' notice. A correct copy of this contract is attached to the complaint.

On or about February 28, 1933 the defendant and Wetherell-Massachusetts orally amended the contract to include the sale by Wetherell-Massachusetts in New England of stainless steel products at a rate of commission of 7½%.

Wetherell-Massachusetts continued to be the only outside sales representative of the defendant in New England until March 1, 1950. During all of the period between June 7, 1930 and March 1, 1950 the defendant maintained its own sales office in Bos-

ton for all of the New England states except Connecticut, and it maintained a sales office in New York covering Connecticut and other territories outside of New England. During all of this period Wetherell-Massachusetts knew of the existence of these sales offices of the defendant and never objected, and does not now object, to the fact that the defendant sold cold rolled strip directly through its own sales force in the New England states.

The term "exclusive selling agents" used in the contract of May 1, 1923 meant to the parties that Wetherell-Massachusetts was to be the exclusive selling agent with the exception of such sales as were made directly by the defendant.

All commissions earned by Wetherell-Massachusetts have been fully paid by the defendant, and there is no dispute between the parties on this point.

On January 16, 1950 the defendant duly notified Wetherell-Massachusetts that the contract between them would terminate two years hence, namely on January 16, 1952.

During the entire period from 1930 until March 1, 1950, the stockholders of Wetherell-Massachusetts were Lawrence H. Wetherell and Frank A. Wetherell, who are brothers, and Helen W. Barney, who is a sister of the two brothers. During the same period, the officers of Wetherell-Massachusetts were Frank A. Wetherell, President; Lawrence H. Wetherell, Treasurer; and Henry B. Patrick (until 1947) and thereafter Loomis Patrick, Clerk. These persons were also the only directors of Wetherell-Massachusetts during the period.

On March 1, 1950, Wetherell-Massachusetts liquidated and distributed all of its assets to its three stockholders. Shortly thereafter it was dissolved as a corporation, and ceased to exist except for the purpose of suing or being sued for three years as provided by Massachusetts law. Wetherell-Massachusetts by this action became incapable of further performing the obligations of its contract with the defendant.

On the same day, to wit, March 1, 1950, the stockholders of Wetherell-Massachusetts sold to Penn Seaboard Iron Company, a corporation organized under the laws of Pennsylvania, all of the assets which they had received from Wetherell-Massachusetts excepting cash and receivables, but including so far as they could an assignment of the contract with the defendant. Thereupon, Penn Seaboard Iron Company changed its name to Wetherell Bros. Co. and Wetherell-Massachusetts changed its name to Wetherell Company.

The procedure for the liquidation of Wetherell-Massachusetts and the sale by its stockholders of a part of those assets to the plaintiff, described above, was adopted by the stockholders of Wetherell-Massachusetts because this procedure was advantageous to them, from the point of view of taxes, over the sale of the stock of Wetherell-Massachusetts to the plaintiff or a sale by Wetherell-Massachusetts of its assets (or part of them) to the plaintiff.

There is no evidence as to what the corporate powers and by-laws of Wetherell-Massachusetts were; nor is there any evidence as to what the corporate powers and by-laws of the plaintiff are; nor is there any evidence as to whether or not the plaintiff is qualified to do business in Massachusetts or any of the other New England states.

The stockholders of the plaintiff, from March 1, 1950 up to the time of the trial, were Harvey McKenney and his wife; and the officers were Lawrence H. Wetherell, President; Harvey McKenney, Vice President and Treasurer; John P. Larkin, Vice President; Barton Grubbs, Secretary; and Loomis Patrick, Assistant Secretary; and these persons were also the only directors.

Neither the plaintiff nor Wetherell-Massachusetts or any representative of either of them ever informed the defendant of the purported assignment of the contract. There is no provision in the contract between Wetherell-Massachusetts and the defendant allowing the assignment of the contract, and at no time did the defendant consent to the assignment of the contract. On or about April 5, 1950, the defendant learned—from sources other than the plaintiff or Wetherell-Massachusetts—that the purported assignment had been made.

On April 11, 1950, Lawrence H. Wetherell had a conversation with Harry M. Francis, Vice President in Charge of Sales of the defendant, at which time Wetherell asked that the defendant recognize the assignment and keep on supplying steel to the plaintiff. Francis, on behalf of the defendant, stated that the defendant would not supply steel to the plaintiff and did not recognize the purported assignment.

Both the plaintiff and Wetherell-Massachusetts intentionally concealed the fact of the purported assignment from the defendant.

The defendant wrote a letter to Wetherell-Massachusetts dated April 19, 1950, notifying Wetherell-Massachusetts that the agreements of May 1, 1923 and June 7, 1930 were terminated as of March 1, 1950. A correct copy of this letter is attached to the defendant's answer. Between March 1, 1950 and April 18, 1950, the defendant received orders for steel from Wetherell Bros. Co.—in fact obtained by the plaintiff —but which the defendant reasonably believed had been obtained by Wetherell Bros. Co., the Massachusetts corporation, and relying on that belief it acknowledged the orders to Wetherell-Massachusetts and assigned mill numbers to those orders.

As soon as the defendant could ascertain the facts concerning these orders, to wit, on May 4, 1950, it returned the orders to Wetherell Bros. Co. and refused to fill them. Two further orders, which had been overlooked on May 4, were returned on May 8.

All but two of the orders returned by the defendant on May 4 and May 8 were re-submitted to the defendant directly by the customers who had originally placed the orders with the plaintiff.

These orders were resubmitted by the customers directly to the defendant, not by reason of any effort on behalf of the plaintiff but because these customers had over the years been supplied with steel produced by the defendant and in the then condition of supply and demand in the steel industry the customers could not fill the orders from any supplier other than the defendant.

In this case, the federal court follows the conflict of laws rules prevailing in the state in which it sits. Klaxon v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. In Old Dominion Copper Mining & Smelting Co. v. Bigelow, 203 Mass. 159, 174, 89 N.E. 193, 200, 40 L.R.A.,N.S., 314, it was said: "Where a contract is made with a purpose by the parties to it that it shall be performed in a particular place, its validity and interpretation are to be determined by the law of the place where it is to be executed. It is made with a view to that law." It is inescapably clear therefore that the contract with which we are here concerned was intended to be performed in this commonwealth, and the court looks, therefore, to the law of Massachusetts with respect to the assignability of the contract.

The evidence discloses that the representatives of Wetherell-Massachusetts signed the contract of June 7, 1930 in New York City. It does not disclose where it was signed by the defendant's representatives. At any rate, counsel for both parties indicated at the trial their belief that the law of Massachusetts does not differ (on this subject) from the law of New York or that of Ohio (where it was believed that the defendant's representatives may have signed the contract).

The plaintiff seeks to hold the defendant liable because of its action in terminating the contract between it (defendant) and Wetherell-Massachusetts. Since admittedly no contract was ever entered into between the plaintiff and the defendant, the question of law is whether the duties of Wetherell-Massachusetts under the contract could be effectively assigned to plaintiff without the consent of the defendant. The conclusion is inescapable: the assignment to the plaintiff of the duties of Wetherell-Massachusetts under its sales agency contract without the consent of the defendant was ineffective for the purpose of substituting the plaintiff for the "assignor" corporation with whom the defendant contracted.

This was a contract for a sales agency within a particular geographical area, an exclusive agency in that only the principal

could compete with Wetherell-Massachusetts in obtaining customers for the defendant's products.

■ "In a contract for a sales agency the personal performance of the agent is practically always a condition precedent to the duty of the principal and employer. The performance of the agent's duty cannot be delegated to a substitute. The assignee of the agent's right must fail, therefore, in his attempt to enforce it if he merely tenders a substituted performance." IV Corbin, Contracts (1951) § 865, P. 444.

In New York Bank Note Co. v. Kidder Press Manufacturing Co., 192 Mass. 391, 78 N.E. 463, the defendant corporation manufactured and improved printing press. It was agreed that the defendant would not sell the press to anyone other than the plaintiff's "predecessor", and that whenever others of the defendant's customers desired to purchase such a press, a sale would be made to the "predecessor" corporation which would then execute a lease to the third party for such money as the defendant should nominate. The Supreme Judicial Court held that "the fiduciary relations between the parties under the term of the contract relating to the proceeds of other sales were such, that without a provision to that effect, which is not found, or without the defendant corporation's assent, which was not given, the plaintiff was not substituted * * *." 192 Mass. at page 404, 78 N.E. at page 465.

The Court later expanded on the reasons underlying the New York Bank Note decision in Brighton Packing Co. v. Butchers' Slaughtering & Melting Association, 211 Mass. 398, 403, 97 N.E. 780, 782.

"The claim has been made also that it is only in a technical sense that these two companies could be called distinct entities. They had the same capital stock and practically the same stockholders, officers and agents; the Maine company had taken over all the assets and assumed all the liabilities, of the other, and was carrying on the same business, at the same stand, in the same manner and under the same management. The master has found that for practical purposes the two companies were the same. Accordingly the plaintiff claims that an agreement with the one is the same as an agreement with the other, that the defendant's ignorance of their separate identity was immaterial, that the agreement may be treated as made with either company indifferently, was capable of enforcement by either or at least by the Maine company, and is valid in the hands and for the benefit of the plaintiff. But we cannot assent to this reasoning. These are two distinct corporations, created by the laws of two different states. The powers of each corporation are limited and controlled by the statutes of the state which created it, and it is scarcely conceivable that the statutes of the two states are the same or that the franchises and powers of the two corporations are identical. But if this were so, it would remain true that they are the creation of two different goverments, the offspring of different parents, and not only distinct legal entities, but having separate and distinct existences. They could and did make contracts with each other; they might bring suits against each other. They are in no respect the same person. This is the basis of our decision in New York Bank Note Co. v. Kidder Press Manuf. Co., 192 Mass. 391, 78 N.E. 463 * * *."

■ The contract in this case is one requiring a relationship of particular trust and confidence, and such a contract cannot be assigned effectively without the consent of the other party to the contract. Paper Products Machine Co. v. Safepack Mills, 239 Mass. 114, 131 N.E. 288; New England Cabinet Works v. Morris, 226 Mass. 246, 115 N.E. 315; American Lithographic Co. v. Ziegler, 216 Mass. 287, 103 N.E. 909. The grant of an exclusive agency to sell one's goods presupposes a reliance upon and confidence in the agent by the principal, even though the agent be what is frequently called a large "impersonal" corporation. It is apparent that the principal in this case must have relied upon the "legal equa-

tion" represented by the corporation which it chose as its sole sales representative in a large area; otherwise, the surrender of the right to grant additional agencies is illogical.

The plaintiff has argued that the fact that the assignment is made from one corporation to another alters the rule of non-assignability of the agent's duties under the contract. The New York Court of Appeals met this argument in an early phase of the New York Bank Note Company litigation. See New York Bank Note Co. v. Hamilton Bank Note E. & P. Co., 180 N.Y. 280, 73 N.E. 48, 51–52:

"The plaintiff was not only technically but substantially a different entity from its predecessor. It is true that in dealing with corporations a party cannot rely on what may be termed the human equation in the company. The personnel of the stockholders and officers of the company may entirely change. But though there is no personal or human equation in the management of a corporation, there is a legal equation which may be of the utmost importance to parties contracting with it. In dealing with natural persons in matters of trust and confidence, personal character is or may be a dominant factor. In similar transactions with a corporation, a substitute for personal character is the charter rights of the corporation, the limits placed on its power, especially to incur debt, the statutory liability of its officers and stockholders. These are matters of great importance when, as at present, many states and territories seem to have entered into the keenest competition in granting charters; each seeking to outbid the other by offering to directors and stockholders the greatest immunity from liability at the lowest cash price."

There is one further question. The plaintiff has also proceeded on the theory that it is entitled to commissions on orders obtained by it and accepted by the defendant under the misapprehension that the plaintiff's assignor had obtained such orders, because after these orders had been returned to the plaintiff they were later submitted directly to defendant by the buyers themselves and filled by the defendant. It is difficult to see how any contract of employment of the plaintiff as a broker can be implied from the facts. A broker without a contract of employment is not entitled to any commission on sales or orders procured by him. McKeon v. Tyler, 1925, 254 Mass. 142, 149 N.E. 615.

In the absence of any such contract of employment between the plaintiff and the defendant, the only manner in which the plaintiff could recover would seem to be on some theory of unjust enrichment of the defendant. As a practical matter, it is hard to show that the defendant received much benefit from the plaintiff's efforts in view of the background of economic facts which existed during the period in question. It is common knowledge that companies such as the defendant which manufacture steel were then and still are having difficulty in allocating the supply of steel among purchasers, and no difficulty in finding purchasers. However, even apart from this practical consideration, and assuming that the plaintiff did in fact confer a benefit of some sort upon the defendant, it still seems clear that in these circumstances plaintiff is at the most a volunteer. As such, it is not entitled to any recovery against the person on whom it "officiously conferred" such services. Restatement, Restitution (1937), Section 2.

Judgment must be entered for the defendant.