## PAUL A. PUMA vs. LOUIS E. GORDON.

Worcester. January 23, 1980. — April 1, 1980.

Present: HALE, C.J., GRANT, & NOLAN, JJ.

*Contract,* Sale of real estate, Performance and breach, Termination.

In an action for specific performance of an agreement for the purchase
and sale of real estate, there was sufficient evidence to warrant the
judge's findings that the assignor of the agreement had been unwilling
to and did not accept the seller's proposed concessions in exchange for
accepting a defective title and that the broker authorized to sell the
property had sought to interest the assignee in the purchase after he
realized the sale to the assignor would not materialize. [492-494]

In an action by the assignee of an agreement for the purchase and sale of
real estate seeking specific performance of the agreement, there was
sufficient evidence to warrant a finding that the seller and the assignor
had mutually abandoned the agreement prior to the assignment.
[494-496]

In an action for specific performance of an agreement for the purchase
and sale of real estate, there was no merit to a contention by the
assignee of the agreement that, because the seller never withdrew a
broker's authority to enter into contracts for sale of the locus, the
assignment was valid. [496]

CIVIL ACTION commenced in the Superior Court on
September 16, 1977.

The case was heard by *Hallisey*, J.

The case was submitted on briefs.

*Kevin M. Keating* for the plaintiff.

*Charles B. Swartwood, III,* for Thomas E. Barnicle &
another, amici curiae, submitted a brief.

NOLAN, J. Paul A. Puma, the plaintiff in one of two cases
consolidated for trial, appeals from a judgment dismissing
his action against Louis Gordon for specific performance of
a purchase and sale agreement. That agreement concerned
property to which Thomas and Gertrude Barnicle success-

fully asserted a similar claim for specific performance in the action which was consolidated with Puma's for trial. The basis of Puma's appeal is that various crucial findings made by the judge are unsupported by the evidence.

Upon careful review of the evidence adduced at trial, we are satisfied that, although contradictory in places and sketchy in others, the evidence supports the judge's findings.

We draw our facts from the judge's findings, which are binding upon us unless "clearly erroneous." *New England Canteen Service, Inc.* v. *Ashley,* 372 Mass. 671, 675 (1977).

On February 5, 1976, the owner of the locus (Gordon) listed it with Ross Fuller's Land Auction Agency (Fuller), giving Fuller power to sign contracts of sale and providing him a commission of ten percent.[1] The "listing agreement" provided that Fuller could accept deposits and that if a sale should not close, Gordon would have no interest in the deposits and Fuller could dispose of them in accordance with any agreement he might make with the prospective purchaser. On closing, however, Fuller would earn a full commission.

On February 17, 1976, a purchase and sale agreement regarding the locus was entered into between Gordon and Mrs. Caroline Novack providing, inter alia, for a deposit of $3,800, another payment of $7,200, and a purchase money note and mortgage of $27,000. The total purchase price was $38,000.

The agreement required that the deed be a warranty deed; that the seller should give and the purchaser accept a title such as any law firm in the Commonwealth would accept and insure; that, in the event the seller should be unable to convey title in accordance with the terms of the agreement, the sole liability of the seller would be to refund the amount paid; that the deed should be delivered on receipt of payments at the office of Fuller on March 31, 1976; and that the agreement could not be changed or terminated orally.

---

[1] The land in question consists of some 102 acres on North Street in Upton.

Novack paid Fuller $3,800, and both parties signed the agreement. Subsequently, Gordon, through Fuller, retained an attorney (Norris) to check the title. The title report was not received before the original closing date of March 31, 1976, and the parties agreed to extend the date without specifying a new date for closing. On May 25, 1976, Norris issued his certificate of title, noting four encumbrances.[2] Consequently, the parties again agreed to extend further the date for closing to permit removal of the encumbrances. No revised date for closing was specified.

Between May and December of 1976, little was accomplished by either party by way of agreeing upon a means to settle their differences regarding the condition and passing of title. Having become concerned with the delay, Gordon, on December 27, 1976, retained another attorney (Consigli) to clear the title. Gordon suggested a closing date of March 11, 1977, but Novack was yet not satisfied with the state of the title. Later in March of 1977, Consigli sent Fuller a proposed note, mortgage and escrow agreement for execution by Novack. They were never signed by her.

By May of 1977, Gordon was growing very impatient with the delays. In June, 1977, the title still not having been cleared, Fuller discussed with Gordon the possibility of granting some concessions to Novack in exchange for her accepting the defective title. Their proposals were not accepted by Novack.

On June 14, 1977, after numerous delays and after having his various proposals to negotiate an agreement by which title could be passed impliedly rejected, Gordon considered the deal with Novack dead and subsequently entered into an agreement with the Barnicles for the sale of the locus for $42,000, with no commission to be paid and with no provision for a purchase money mortgage. The agreement called

---

[2] (a) An attachment in the amount of $4,500 on the locus that was recorded on April 30, 1976; (b) mineral rights in the locus conveyed to one Victor S. Depres in January, 1938, by Gordon's predecessor in title; (c) a minor error in description; and (d) an inheritance tax certificate that was not but should have been recorded.

for a quitclaim deed and contained a provision that the seller "could" use the purchase money to clear any encumbrances. Gordon did not advise Fuller, Consigli or Norris of this agreement. In July, 1977, Consigli sent Fuller and Norris a revised form of the deed, mortgage and note for use in connection with a sale to Novack. These were never executed by Novack or Gordon.

The trial judge inferred from all the evidence that by early September, 1977, Fuller realized that the Novack sale would not go through and sought to interest Puma in the purchase. Puma was not told of the title or other problems. On September 3, 1977, Fuller arranged for an assignment by Novack to Puma of all Novack's interests in the February 17, 1976, agreement with Gordon. Puma paid Novack $1,000 for the assignment. On September 9, Fuller edited the July, 1977, forms, changing the deed to September 9 and the name of the purchaser to Paul Puma, and had Puma sign the note, mortgage and escrow agreement. When Fuller told Gordon of Puma's interest, Gordon rejected the idea and told Fuller of the agreement with the Barnicles. On September 13, 1977, Fuller told Puma of the problem, encouraged him to sue Gordon, and agreed to share the expenses of the suit.[3] On September 15, 1977, the Barnicles, in accordance with their agreement with Gordon, appeared at the registry prepared and able to close, but Gordon did not attend.

Action was commenced by Puma on September 16, 1977. The Barnicles sued thereafter. The cases were consolidated for trial.

On all the evidence, the judge inferred that Novack was unwilling to accept a defective title in June, 1977, and was

---

[3] Fuller's interest in the outcome of the litigation apparently influenced the judge in choosing not to credit Fuller's (the only) testimony supporting Novack's willingness to accept defective title, as proposed at one point by Gordon. Because there was contradictory evidence on this issue, the judge's determination of the credibility and weight of Fuller's testimony is accepted by this court. *Oberg* v. *Burke,* 345 Mass. 596, 598 (1963). *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 675 (1977).

unwilling to accept the concession proposed by Fuller. The
judge concluded that Gordon and Novack had effectively
cancelled and rescinded[4] their agreement before Fuller
orchestrated the assignment of Novack's interest therein to
Puma. Consistent with this, the judge concluded that Gor-
don was free to contract with the Barnicles for the sale of
the locus on June 14, 1977, and, therefore, allowed the Bar-
nicles' claim for specific performance.

Puma's principal arguments are these: (1) there is no evi-
dence supporting the judge's finding that Novack was un-
willing to and did not accept Gordon's proposed concessions
of June, 1977; (2) the only evidence supporting the conclu-
sion that Gordon considered the agreement with Novack
"dead" was the fact that he agreed, on June 14, 1977, to sell
the same property to Barnicle (This fact, Puma argues, must
be viewed in light of Gordon's failure to inform Consigli,
Fuller, or Novack of the agreement with the Barnicles, as

---

[4] The judge correctly pointed out that although the "termination
clause" in the agreement provided that, " (i)n the event the Seller is unable
to convey title in accordance with the terms of this contract, the sole lia-
bility of the Seller will be to refund to the Purchaser the amount paid on
account of the purchase price," this apparent escape route provided Gor-
don is illusory. Such a termination clause will operate only when a defect
in title existed before the contract was made and arose through no fault of
the seller. *Oberg* v. *Burke*, 345 Mass. 596, 598-599 (1963). *Rousseau* v.
*Mesite*, 355 Mass. 567, 571 (1969).

In the present case, the $4,500 attachment arose after the Gordon-
Novack agreement was made, and arose from litigation involving Gor-
don's prior agreement to sell the same property to another individual and
Gordon's default thereon.

Accordingly, Gordon had an affirmative duty to satisfy and eliminate
at least the $4,500 attachment, notwithstanding the termination clause in
the contract.

Nonetheless the parties agreed several times to extend time for perform-
ance without specifying a date for passing title. Therefore, although
Novack could have sued for breach of contract, seeking specific perform-
ance, after March 31, 1976, the initial closing date, Gordon having
repeatedly failed to clear and convey title within a "reasonable time," see
*Marlowe* v. *O'Brien*, 321 Mass. 384, 386 (1947), *Younker* v. *Pacelli*, 354
Mass. 738, 741 (1968), Novack failed to avail herself of this remedy.

Subsequently, as the judge found, both parties simply abandoned the
contract.

well as his failure to withdraw the written authority vested in Fuller to enter into agreements for the sale of the locus); and (3) there is no evidence supporting the finding that "by early September, 1977, Fuller realized the Novack sale would not materialize, and he sought to interest Puma in the purchase."

As to arguments (1) and (3), we need only say that we have read the transcript carefully and that, giving the judge's assessment of the credibility of the witnesses its due, *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. at 675, we are satisfied that the findings and the inferences he drew are supported by the evidence. *Casey* v. *Gallagher,* 326 Mass. 746 (1951).

Puma's second argument is two-pronged. First, he urges that there is insufficient evidence to support a finding, or a legal conclusion, that Gordon acted in such a way as to manifest an intent to rescind the contract with Novack, or, alternatively, that Gordon, because of his silence regarding the "new" agreement with the Barnicles, is estopped to disavow the agreement with Novack. Second, Puma argues that, in any event, Gordon did not withdraw Fuller's authority to enter into contracts for sale of the locus and was bound by Fuller's "apparent authority" to commit Gordon to Puma. See Restatement (Second) of Agency § 130 (1958). We shall treat Puma's arguments in the order in which they appear.

Puma argues that Gordon's contracting with the Barnicles, without notice to Novack, does not support the judge's conclusion of mutual abandonment of the agreement by Gordon and Novack. While it is true that the judge points to Gordon's contracting with the Barnicles as evidence of his intent to abandon the contract with Novack, his findings and discussion contain additional evidence of mutual abandonment.

The judge emphasized: (a) Gordon's continued frustration and growing impatience with Novack's failure to respond concretely to his offers of compromise; (b) Novack's failure to act on Gordon's proposed closing for March 11,

1977; (c) Novack's failure to respond to a proposed note, mortgage and escrow received from Consigli later in March of 1977; (d) Novack's failure to accept various concessions proposed by Fuller, on behalf of Gordon, in June of 1977, all of which occurred before Gordon contacted the Barnicles with respect to the locus in question; and (e) Novack's failure to act on a revised form of deed, mortgage and note proposed by Consigli in July of 1977.[5]

From this series of fruitless negotiations, the judge concluded that at some time during the summer of 1977, and before Fuller orchestrated the assignment of Novack's rights to Puma, both Gordon and Novack considered the deal between them dead. The fact that the judge could not pinpoint the actual date of abandonment does not detract from the conclusion that the parties gradually drew apart, manifesting an intent to be no longer bound by the agreement. An agreement to rescind a contract need not be made in any formal, express terms. Rather, mutual assent to a rescission may be inferred from the attendant circumstances and conduct of the parties. *Hobbs* v. *Columbia Falls Brick Co.*, 157 Mass. 109, 111 (1892). *Flaherty* v. *Goldinger*, 249 Mass. 564, 567 (1924). See *Mendez* v. *Trustees of Boston University*, 362 Mass. 353, 357 (1972). 15 Williston, Contracts § 1826, at 483 (3d ed. 1972).

Whether the conduct of the parties here demonstrated mutual assent to an abandonment or rescission was a question of fact. *Hanson & Parker* v. *Wittenberg*, 205 Mass. 319, 327 (1910). *Watkins* v. *Simplex Time Recorder Co.*, 316 Mass. 217, 223 (1944). On this record, we cannot say that the judge's subsidiary findings are clearly erroneous or that they fail to support a conclusion that Gordon and Novack mutually rescinded their agreement. See *Mendez* v. *Trustees of*

---

[5] In addition to the facts found by the judge, we note on our own that on May 4, 1977, Gordon wrote to Novack and her lawyer, that he intended to find another buyer if the deal should not be closed promptly. From the entire record and transcript before us, we can and do find this fact. See *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 255 (1977); *Olsson* v. *Waite*, 373 Mass. 517, 520 (1977).

*Boston University,* 362 Mass. at 357; *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. at 674. Similarly, Puma may not rely on an argument of estoppel, because both Gordon and Novack abandoned the agreement. Contrast *Capozzi's Case,* 4 Mass. App. Ct. 342, 347 (1976).

Puma concludes by arguing that Gordon never withdrew Fuller's authority to enter into contracts for him and that, therefore, Novack's assignment to Puma is valid. This argument fails for three reasons. First, the "listing agreement" provided merely that Fuller could sign contracts of sale but implicitly provided that such contracts need not necessarily "close." Second, the Gordon-Novack agreement required Gordon to take back a mortgage note of $28,000 and as such involved a relationship of trust and confidence between the parties, 3 Williston, Contracts § 421, at 121 (3d ed. 1960), which could not be assigned without Gordon's consent, *New England Cabinet Works* v. *Morris,* 226 Mass. 246, 250 (1917), *Paper Products Machine Co.* v. *SafePack Mills,* 239 Mass. 114, 122 (1921), which he declined to give. Finally, as the Gordon-Novack agreement had expired, there was nothing to assign.

*Judgment affirmed.*