Greco, P.J.
The plaintiff, Jonathan Feldman (“Feldman”), in his capacity as trustee of the Jumbo Realty Trust (“Jumbo Realty”), filed a complaint against the defendants seeking damages for breach of a lease agreement. The defendants, Laura Jasinski (“Jasinski”), Claire McGrath (“McGrath”), and Amanda Forsythe (“Forsythe”), are three students who entered into the lease, along with their parents who signed as guarantors. The defendants, who each made an initial payment for an individual share of the first and last month’s rent and the security deposit, never actually resided on the premises. The defendants counterclaimed, seeking return of any moneys paid and for violation of the security deposit law, G.L.c. 186, §15B. After a jury-waived trial, the court found against Feldman on his complaint, and for the defendants on their counterclaims. Feldman has appealed. Since the issues on appeal relate only to the sufficiency of the evidence, we must determine whether there was evidentiary support for the trial judge’s findings of fact and conclusions of law. The judge’s findings and the evidence in the record supporting those findings indicate the following.
The lease agreement at issue was for the rental of an apartment on Adams Street in Somerville for one year for a monthly rent of $1,800.00. The apartment had a history of being leased to students at nearby Tufts University; the renters in possession at the time the defendants signed their lease were Tufts students, and the defendants were also to attend Tufts. The lease was to commence on June 1, 2005.[3] Before that date, the defendants paid Jumbo Realty $5,400.00, representing the first and last month’s rent, along with an $1,800.00 security deposit. Paragraph 8 of the lease provided that if the plaintiff, “through no fault of his own,” was unable to deliver the premises to the students on June 1, 2005, their rent would be “abated on a pro rata basis until such time as occupancy can be obtained, which abatement shall constitute full settlement of all damages caused by such delay.” Paragraph 8 further provided *244 that the plaintiff was allowed up to thirty days to deliver the premises to the students. If the plaintiff were unable to do so, either party to the lease could terminate the lease and any payments made under the lease would be refunded. Jumbo Really never sent a fully executed copy of the lease to the students and never deposited the students’ security deposit in a segregated account as required by G.L.c. 186, §15B(3) (a).
One of the students, McGrath, was planning to move into the apartment on the first day of the lease, i.e., June 1st. On that date, however, the prior tenants had not moved out. McGrath spoke to one of those tenants who indicated he was going to move out by the next morning. When she and her roommates were finally able to get into their unit, they found the apartment in a deplorable condition. To list only some of the problems, furniture was still there; trash was everywhere; the kitchen was filthy; there was mold and mildew under the kitchen cabinets; the sink “was mildewy and rusty and gross”; in some of the rooms, there were “pretty large water stains” on the ceilings; walls had holes in them; paint was peeling off a radiator; “there was a strong smell of gas from the stove”; and there were “rodent droppings” in the pantry. In the bathroom, “water was leaking through the ceiling into [a] light-bulb,” which “later filled up and burst”; the toilet “was not cleaned”; in the medicine cabinet, there was mold and rust that “was flaking into the sink”; there was also mold and rust in the tub; the sink was cracked; and the vanity was “warped.”[4]
When the defendants complained to Feldman about these conditions, he was initially “disgusted” and angry. When he failed to respond to further inquiries, the students made some attempts to clean the apartment “so that [they] could essentially just store [their] things.” A couple of days later, Jasinski spoke to Feldman’s handyman, Mike, who said that “he was doing what he could, but that he could not malee [her] any guarantees and tell [her] timetables of anything.” Jasinski was able to reach Feldman on June 3rd, but he said he was too busy to meet with her. He subsequently told her that she should make a list of what had to be done in the apartment and give it to Mike. When she did so, Mike essentially repeated what he had said earlier. In a later conversation, Feldman gave Jasinski telephone numbers of contractors and told her to contact them herself. When she responded that she was not able to do that, he told her that “it was not as if the house was burning” and that she was “overreacting.”
Jasinski’s father, Paul, was also making efforts to have the situation remedied.[5] After speaking to Mike, who “agreed with him that the apartment was certainly not livable because there was no bathroom and the kitchen needed major cleaning to be inhabitable,” and after learning of his daughter’s conversation with Feldman, Paul Jasinski contacted Feldman himself. Feldman told him he “had no time” for him in that he was “a busy man” with “other apartments.” When Paul Jasinski complained that he was unable to move his daughter into the apartment, Feldman said, ‘Why *245 don’t you go find another place for the girls to live. I’ll send you all your money back.” Paul Jasinski accepted that offer, stating, “I will find another place for the girls to live. We will have our things moved out of the apartment just as soon as we can. We will look for an apartment immediately.” The students were out of the apartment by June 9,2005. At that point, only a minimal number of the repairs had been made.
At trial, Feldman denied having the above conversation with Paul Jasinski. He maintained that Paragraph 8 of the lease allowed him thirty days to remedy any problems, that the repairs in the bathroom were done by June 5th, that most of the other repairs were made by June 7th, and that the apartment was in “[pjerfect condition” by June 15th. On June 7,2005, he left a copy of the lease in the apartment.
Based upon the above evidence, the trial judge found that “Jumbo Realty was unable to deliver the premises to the Defendants on June 1, 2005 as required by the lease and the failure to do so was entirely the fault of Jumbo Realty,” and that Jumbo Realty’s actions amounted to “a material breach” that entitled the students to rescind the lease agreement and recover the money they had paid. In so concluding, the judge noted that he found the testimony of the students and Paul Jasinski “most credible and the testimony of Jonathan Feldman on behalf of Jumbo Realty not credible.” Accordingly, he found for the students on the plaintiff’s complaint and for the students and their parents on their counterclaims, awarding them $9,000.00 in damages (i.e., $5,400.00 for the moneys paid when the lease was signed, and $3,600.00 for violation of the security deposit law).
In the landmark case of Boston Hous. Auth. v. Hemingway, 363 Mass. 184 (1973), the Supreme Judicial Court held that
in a rental of any premises for dwelling purposes, under a written or oral lease, for a specified time or at will, there is an implied warranty that the premises are fit for human occupation. This means that at the inception of the rental there are no latent [or patent] defects in facilities vital to the use of the premises for residential purposes and that these essential facilities will remain during the entire term in a condition which makes the property livable.’
Id. at 199, quoting Kline v. Burns, 111 N.H. 87, 92 (1971). The implied warranty of habitability cannot be “waived by any provision in the lease or rental agreement.” Boston Hous. Auth., supra. Thus, “[t]he landlord promises to provide and maintain residential premises in a habitable condition. The tenant promises to pay the agreed upon rent for the habitable premises.” Jablonski v. Casey, 64 Mass. App. Ct. 744, 746 (2005). The trial judge in this case found that the apartment was “in a deplorable condition” and “not habitable.” Those findings “will not be set aside unless they are clearly erroneous, bearing in mind the deference that must be given to the trial judge’s opportunity to weigh the credibility of the witnesses.” Id. at 747. The evidence outlined above fully supported the court’s findings. This was not a situation in which an apartment was merely dirty, even filthy, and littered with trash. Here, the kitchen and bathroom were unusable. It could have readily been inferred that the apartment would have violated any applicable sanitary code. The condition of the apartment constituted a material and substantial breach of the warranty of habitability. Given Jumbo Realty’s breach of its obligation to provide a habitable apartment, *246 the defendants were excused from further performance under the lease. Petrangelo v. Pollard, 356 Mass. 696, 701-702 (1970).[6]
Any reliance on Paragraph 8 by Feldman and Jumbo Realty to hold the defendants liable is misplaced. Even if that provision were not “deemed to be against public policy and void,” G.L.c. 186, §15, the defendants were relieved of their obligation to occupy the premises by the very terms of the lease provision. It was through Feldman’s own fault that he was unable to deliver the premises to the students on June 1st. This was not a situation in which some unexpected event happened immediately prior to the commencement of the lease, such as a fire breaking out, a pipe bursting, or a storm causing a tree to fall on the house. Feldman arranged this so that the new tenants would take occupancy immediately after the prior lease ended, leaving no time to clean the apartment and check for any damage. He was aware that Paul Jasinski reasonably expected the apartment to be broom clean. And Feldman already had notice that there was a problem with leaks from the apartment upstairs. Even if that had not been the case, it was predictable that the apartment would not be immediately habitable, let alone broom clean. Under the lease used by Feldman, he had the right to enter the apartment while it was occupied by the prior tenants “to inspect the premises.” However, apparently in an effort to maximize his flow of income, he chose not to take such a precaution, scheduled the commencement of the new lease immediately after the expiration of the former one, and essentially gave himself up to a thirty-day grace period to fix any problems. Such gross indifference on his part qualified as “fault” under Paragraph 8 of the lease. “Every contract implies good faith and fair dealing between the parties to it .’’Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991), quoting Kerrigan v. City of Boston, 361 Mass. 24, 33 (1972). As noted in Anthony’s Pier Four, Inc., supra, quoting Uproar Co. v. National Broadcasting Co., 81 F.2d 373, 377 (1st Cir. 1936), “neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.” Yet that is exactly what Feldman did.
Finally, in finding for the defendants, the trial judge did not directly address the issue of whether the lease was rescinded by agreement of the parties. However, the trial judge clearly stated that he believed the testimony of the defendants over that of Feldman. The starkest conflict in the parties’ testimony related to whether the lease was rescinded by agreement. At least implicitly, then, it would appear that the judge credited the testimony of Paul Jasinski to the effect that it was agreed that the students would move their belongings out so that they could find another apartment and that Feldman would return the moneys they had paid. “An agreement to rescind a contract need not be made in any formal, express terms. Rather, mutual assent to a rescission may be inferred from the attendant circumstances and conduct of the parties.” Puma v. Gordon, 9 Mass. App. Ct. 489, 495 (1980).
Thus, there are three theories supporting the rulings of the trial court, namely, *247 the plaintiffs breach of contract in failing to deliver a habitable apartment, the plaintiffs violation of Paragraph 8, and rescission. On the basis of any of these theories of recovery, the defendants were entitled on their counterclaims to a return of the moneys they had paid. As to the violation of the security deposit law, they were entitled to treble damages and attorney’s fees.
Judgment for the defendants on both their counterclaim and the plaintiffs complaint is affirmed.
So ordered.

 On May 30,2005, Paul Jasinski called Feldman and asked him to “take a look at the apartment and make sure it was in broom-clean condition” since the defendants had rented a truck and were moving in on June 2, 2005.

 There was also evidence that there was a problem with the bathroom in the apartment directly above the one the defendants were renting. “All the tiling was coming loose, so there were excessive amounts of water ... spilling into the woodwork ... underneath whenever [one] took a shower. It was moldy and mildewy and ... [with] very damaged rotted wood that you could see through the tiles.”

 By this point, the Jasinskis were authorized to act for the other defendants, and were taking the laboring oar in dealing with Feldman.

 Implicit in the obligation of a landlord to deliver habitable premises at the inception of a tenancy is the landlord’s or lessor’s affirmative obligation to inspect the premises to ensure that the apartment meets the minimum standards of Article II of the State Sanitary Code prior to occupancy by new tenants. See Berman & Sons, Inc. v. Jefferson, 379 Mass. 196 (1979); Jablonski v. Clemons, 60 Mass. App. Ct. 473 (2004); McKenna v. Begin, 5 Mass. App. Ct. 304 (1977). Had that obligation been fulfilled here, the unsuspecting tenants would never have moved into an apartment in such deplorable condition.