JOHN J. DURKIN, JR. vs. GEORGE H. FERREIRA & another.[1]

Barnstable. December 6, 1985. — April 1, 1986.

Present: GRANT, CUTTER, & ARMSTRONG, JJ.

*Contract*, Sale of real estate, Performance and breach, Specific performance.

Under a contract for sale of real estate which provided in part that the obligations of the parties would cease if the seller was unable to give good title, the buyer was entitled to specific performance of the agreement even though the property was encumbered by three tax liens, where it appeared that the seller was aware of the liens before entering into the agreement but made no effort to discharge them, that the seller had not "acted in good faith" and did "not intend to carry out the agreement," and that the buyer had not waived his right to sue. [775-776]

CIVIL ACTION commenced in the Superior Court Department on October 4, 1983.

The case was heard by *John J. Irwin, Jr., J.*

*Gerald M. Kirby* for the defendants.

*Duane P. Landreth* for the plaintiff.

CUTTER, J. The plaintiff (Durkin) in August, 1983, entered into a purchase and sale agreement with the defendant Ferreira to purchase for $70,000 two lots (the locus) on Route 28A in West Falmouth. Record title to the locus then stood in the name of William Bonito, the codefendant, but Ferreira "was the true owner." The purchase and sale agreement provided that conveyance was to take place on September 7, 1983, at the Barnstable registry of deeds, by quitclaim deed conveying "a good and clear record and marketable title" to the locus "free from encumbrances" with exceptions not here pertinent.[2]

---

[1] William Bonito, brother-in-law of Ferreira.

[2] The agreement was on the Greater Boston Real Estate Board 1978 standard form purchase and sale agreement, arts. 10 and 11 of which read in part (article titles omitted): 10. "If the SELLER [Ferreira] shall be unable to give title or to make conveyance, or to deliver possession of the premises,

Appropriate deeds and checks were delivered to Durkin's attorney, Mr. Frank K. Duffy, under an escrow arrangement. Duffy then discovered that, with respect to Ferreira, three tax liens had been filed in the registry of deeds on February 18, 1983, by a representative of the Department of Revenue of the Commonwealth. The liens were for unpaid meals or sales taxes under G. L. c. 64B or 64H; room occupancy taxes, c. 64G; and withholding taxes, c. 62B, amounting in the aggregate to $4,867.63. Mr. Duffy refused to record the conveyances and to deliver the checks held under the escrow arrangement. Ferreira had been aware of the liens[3] "at all times" from "early

---

all as herein stipulated . . . then any payments made under this agreement shall be refunded and all other obligations of the parties hereto shall cease and this agreement shall be void and without recourse to the parties hereto, unless the SELLER elects to use reasonable efforts to remove any defects in title . . . or to make the said premises conform to the provisions hereof, as the case may be, in which event the SELLER shall give written notice thereof to the BUYER [Durkin] at or before the time for performance hereunder, and thereupon the time for performance hereof shall be extended for a period of thirty days." 11. "If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, . . . all as herein agreed, . . . then, at the BUYER'S option, any payments made under this agreement shall be forthwith refunded and all other obligations of all parties hereto shall cease and this agreement shall be void without recourse to the parties hereto."

[3] These liens were asserted under G. L. c. 62C, § 50, as amended by St. 1978, c. 514, §§ 133, 134. Section 50 (a) imposes "a lien in favor of the [C]ommonwealth upon all property and *rights to property*" (emphasis supplied) of the person against whom the lien is asserted. When the liens were recorded on February 18, 1983, the locus stood in the name of Bonito on the registry records. Whether a recorded tax lien under c. 62C, § 50, applies to after-acquired property of record appears to be a matter about which doubt exists. See Park, Real Estate Law § 580, at 694 (1981); Mendler, Massachusetts Conveyancers' Handbook § 5:12:04 (3d ed. 1984); Bailey & Van Dorn, Taxation, § 403 (1986). See, as to such doubts, *Guleserian* v. *Pilgrim Trust Co.,* 331 Mass. 431, 435-437 (1954). See also *Mishara* v. *Albion,* 341 Mass. 652, 654-658 (1961); *Smith* v. *Allmon,* 17 Mass. App. Ct. 712, 716 (1984); *Fall River Sav. Bank* v. *Callahan,* 18 Mass. App. Ct. 76, 79-83 (1984). There was evidence that Ferreira told Durkin of his beneficial interest in the locus. Because of this, there was risk that any purchase of the locus by Durkin would have been with notice of that interest and therefore that he would have been subject to the tax liens if not therefore discharged. The uncertainties concerning the scope of G. L. c. 62C, § 50, obviously make it an area in which legislative clarification would be beneficial.

in 1983" and "made no effort to correct this encumbrance of which he was the cause." The liens "were not removed and on September 26, 1983, Ferreira decided he would not proceed with the transaction." The deeds and money held under the escrow arrangement were returned to the persons who had deposited them. Durkin (in a letter or letters dated September 29, 1983) specifically "reserved his right to sue Ferreira for specific performance or for damages." The judge, in addition to his findings outlined above, found "that Durkin did not waive his right to sue." He also found that "Ferreira did not act in good faith but rather acted out of the belief that he could get more money from another purchaser," and that later Ferreira offered to sell the locus to Durkin for $95,000. This offer was rejected.

A complaint by Durkin seeking specific performance was heard (without jury) by a Superior Court judge. He made the findings already summarized and ruled, relying largely on *Lafond* v. *Frame,* 327 Mass. 364, 367 (1951), that Durkin was entitled to specific performance of the purchase and sale agreement.

1. The decision in this matter rests upon the application to the present facts of the so-called "escape clause" quoted above in n.2. In *Old Colony Trust Co.* v. *Chauncey,* 214 Mass. 271, 273 (1913), Chief Justice Rugg said that essentially this provision "must be read as a whole, and all its language given a reasonable effect. It is not an absolute and unqualified agreement by the one party to sell and by the other to buy real estate with a good and sufficient title. It contains the stipulation quoted which governs the rights of the respective parties in the event that the defendant should be unable to give a good title. This clause means that if it turns out that *without fault on the part* of the defendants [vendors] subsequent to the execution of the contract they have a defective title, then, after refunding payments made, all obligations of both parties shall cease. The language is plain and unequivocal. It does not make the duties and responsibilities of either party in that event depend upon the option of the other, but by apt language puts an end to the binding force of the contract as respects either

party. Such a contract is not unreasonable, and it establishes important rights an duties. A landowner might be willing to sell only upon the assumption that his title was good, and prefer to keep it if any cloud upon it was disclosed, rather than to be at the expense of removing it, while a prospective purchaser might desire to agree to buy upon precisely these terms. If it had been the intention of the parties to make the obligation to convey or make good defects in title turn upon any other event than the quality of the owner's title, it would have been simple to express it." (Emphasis supplied.)

The *Chauncey* case has been followed in other, similar situations where the agreement contained no provision interpreted as requiring the vendor "to remove or to use reasonable efforts . . . to remove any defect in title." *Barrett* v. *Carney,* 337 Mass. 466, 468 (1958). *Sawl* v. *Kwiatkowski,* 349 Mass. 712, 715 (1965). *Sachs* v. *Hirshom,* 16 Mass. App. Ct. 704, 705-706 (1983). See *Trabucco* v. *Nelson,* 8 Mass. App. Ct. 641, 644-645 (1979), citing various cases in which bad faith had not been found "merely because a seller was responsible for the encumbrance on the property or because it was within the seller's power to have the encumbrance removed by paying off an obligation." *Id.* at 645. Compare situations where the contractual arrangements have been interpreted as requiring a party to the agreement to make reasonable efforts to accomplish some objective, e.g., *Stabile* v. *McCarthy,* 336 Mass. 399, 402-404 (1957), and see *Sachs* v. *Hirshom,* 16 Mass. App. Ct. at 706-708, where summary judgment was reversed because implicit material issues of fact existed in a somewhat similar situation.

In *Lafond* v. *Frame,* 327 Mass. at 366, the Supreme Judicial Court considered a contract to sell residential real estate. The vendor refused to take steps to discharge a bank mortgage which she could pay off prior to the date set for conveyance. The trial judge had found (at 366) that the vendor had "not acted in good faith and does not intend to carry out the agreement." The judge also had ruled that the mortgage was an encumbrance which the vendor was under an obligation to discharge either before, or at the time of, passing papers. The

purchaser (who sought specific performance) in the circumstances was bound, so the opinion said (at 367), to show that the vendor's inability to give a good and clear title "was the result of her own fault or collusion. . . . The [escape] clause [see note 2, *supra*] is no protection to an owner who is not acting in good faith and does not intend to carry out the agreement."

The opinion (at 368) went on to hold that the trial judge's findings that the vendor had not "acted in good faith" and did "not intend to carry out the agreement" were not plainly wrong. The existence of the mortgage was known to the vendor, herself the mortgagor, who "made no attempt to show financial inability to discharge it . . . ." The opinion ruled that "[i]n these circumstances the [trial] judge justifiably found that the . . . [vendor] did not sell merely because she did not wish to do so."

In *Berry* v. *Nardozzi*, 362 Mass. 145, 149 (1972), the *Lafond* case was relied upon in ruling that the escape clause "is of no protection to an owner who is not acting in good faith and does not intend to carry out the agreement." A statement from that vendor that "his former wife would not release her interest in the land," made at a time when he was in possession of a deed from her releasing her interest, was held to be a sufficient basis for an inference that the vendor was not acting in good faith and did not intend to carry out the agreement. *Id.* at 150. See *Oberg* v. *Burke*, 345 Mass. 596, 599 (1963).

We conclude, on the conflicting and confusing evidence, some of which is mentioned in the margin,[4] that the trial judge reasonably could conclude, as he did, that Ferreira was not

---

[4] In the present case the evidence (and reasonable inferences from it) justified the following findings: Ferreira knew of the tax liens long prior to signing the agreement. He made no effort to discharge the tax liens, which he disputed on various grounds. Ferreira's attorney, just before the time set for the conveyance, informed Durkin's attorney that Ferreira "just doesn't want to go through with" the conveyance. At the time the agreement was signed, Ferriera had a business opportunity which was an incentive to put through rapidly this deal with Durkin so that he would be in an easier cash position. On indefinite and rambling testimony of Ferreira, the judge could reasonably infer that Ferreira had lost interest in the business opportunity. As already noted, Ferreira later offered the property to Durkin at $95,000.

acting in good faith and felt free at all times during the transaction to decide that he would not proceed with the conveyance, relying on the escape clause (note 2, *supra*) to avoid liability. This, we think, under the *Lafond* case, 327 Mass. at 367-368, and the *Berry* case, 362 Mass. at 149-150, reasonably could be regarded as lack of good faith and absence of intention to carry out the agreement.

2. The judge, on conflicting evidence (see *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 675 [1977]), concluded that Durkin did not waive his right to seek specific performance or damages by Mr. Duffy's action on September 28, 1983, in returning to Ferreira's attorney the deeds deposited with him under an escrow arrangement and returning (or accepting the return) to Durkin of the purchase money checks. The judge properly could rely on the reservation of Durkin's rights to litigate contained in Mr. Duffy's careful letter of September 29, 1983, and on his testimony that he told Ferreira's attorney (at the time of return of the deeds) that Durkin would probably bring suit. Despite the possibility that different inferences could have been drawn and a different conclusion reached upon the evidence, the judge who heard and saw the witnesses could assess their credibility. Compare *Flaherty* v. *Goldinger,* 249 Mass. 564, 567 (1924). Compare also *Puma* v. *Gordon,* 9 Mass. App. Ct. 489, 495 (1980).

*Judgment affirmed.*