MARIAN M. MCCARTHY vs. ANDREW G. MILLS & others.[1]

No. 87-535.

Suffolk.  March 10, 1988. — July 20, 1988.

Present: GRANT, CUTTER & BROWN, JJ.

*Contract,* Sale of real estate, Performance and breach, Specific performance.

A new trial was required in an action seeking damages or specific perform-
ance for a seller's failure to convey a condominium unit, where the
judge had incorrectly ruled that certain language in the purchase and
sale agreement constituted an obligation of the seller to construct a deck
on the unit rather than an obligation of the seller to use reasonable efforts
to build the deck, and where, as a consequence, factual issues that turned
on the incorrect ruling remained unresolved. [230-231]

CIVIL ACTION commenced in the Superior Court Department
on July 2, 1984.

The case was heard by *Paul K. Connolly,* J.

*Eric A. Deutsch* for the defendants.

*Joseph M. Princi* for the plaintiff.

CUTTER, J. The defendants (the owners) on April 11, 1984,
were the record owners of condominium unit #2, 18 Monument
Square (the locus), a Charlestown building then about 130
years old. The Seusses (see n.1), husband and wife, owned
and lived in unit #3 (third and fourth floors). Mills and his
wife owned and lived in unit #1 (ground and first floors).[2]

---

[1] C. David Seuss and Priscilla A. Seuss.

[2] Mills and Priscilla Seuss were the trustees of Seussmills Condominiums,
the condominium trust for the locus. The master deed for the locus provided,
among other matters, that "[n]o work shall be performed which will affect
the structural integrity of the building or which may result in overruns of
the common utilities, all as determined by the [b]oard of [t]rustees." The
purchase of the locus and the establishment of the building as a three-unit
condominium had been arranged by the Seuss and Mills couples. No one
of the owners had architectural or real estate experience, but they (as well

The owners retained a broker to list unit #2 for sale. Joseph Gannon of the brokerage firm told the owners that, for them to sell unit #2, they would have to build a second means of egress from that unit.

The plaintiff, Marian M. McCarthy (the buyer), began negotiations for unit #2. On February 17, 1984, the owners accepted in writing an offer from her to buy unit #2 for $80,000. This written offer and acceptance was subject, among other items, to "(3) Subject to second means of egress & [to] deck space," which Miss McCarthy had indicated was the form which she wanted the second means of egress to take.

This written offer and acceptance was supplanted on April 11, 1984, by a 1979 standard form condominium purchase and sale agreement (published by the Greater Boston Real Estate Board) which stated that the price was to be $80,000, and the total deposit to be $8,000. The agreement (hereafter "the April agreement") in par. 4 provided for delivery on May 30, 1984, of a good and sufficient unit deed which "shall convey a good and clear record and marketable title," to the buyer (or her nominee), free from all encumbrances except the standard form printed exceptions and, taking into account certain attached riders. The April agreement contained a rider of which only par. 3 need now be set out in the margin.[3] See, however, note 7 *infra*. The April agreement also contained the provisions of the standard printed form, pars. 9 through 12, which are set out in the appendix, *infra*.[4]

---

as the buyer) were represented by counsel at various stages of the negotiations. The buyer, whose principal job was as a flight attendant for an airline, also held a real estate sales license.

[3] "3. *Buyer's obligation* to consummate this purchase and sale agreement and accept delivery of the deed is *subject to* Seller's installation of a second means of egress and said deck to be 7 x 20' with railing and deck space.* [*Satisfactory to Buyer] Buyer and Seller agree that said deck will have to conform with all the local City of Boston[,] state[,] and federal laws" (emphasis supplied).

[4] The closing date stated in the April agreement was May 30, 1984. The judge and the jury each found that the closing, by conduct or agreement of the parties, was extended to June 29, 1984. There was no finding that the owners (pursuant to par. 10 of the April agreement) transmitted to the buyer any written election to make further efforts to cause the premises to conform with the provisions of the agreement as interpreted by the judge.

The trial judge found that, from "mid-March through June of 1984," the owners made "various efforts toward . . . installation of the deck" and consulted the building department for the city of Boston and with a neighbor of the owners with respect to connecting the proposed deck with the neighbor's existing fire escape. They also consulted with and retained architects. Detailed plans were drawn up and "different methods of construction proposed." There was evidence that difficulties were encountered in making contact with the neighbor to gain his permission to connect with his existing fire escape.

There was testimony that the architectural firm, retained in early April to design the deck, assigned to the task an employee, Edwin Steel. Steel later was ruled by the judge to be qualified as an expert in the restoration of buildings more than 100 years old. Steel, in turn, retained a firm of structural engineers, Connor & Power. Joint examination by Steel and Power (of the engineering firm) showed, according to Steel's testimony, that, of two methods proposed by Steel for building the deck, the first (if used) would definitely result in the collapse of the side wall of the locus toward the deck and the second method would cause a "serious" risk of destruction of a ceiling in unit #1.

Steel also testified that he consulted a builder and was given an estimate which he relayed to one of the owners. An offer of proof was made that the estimate was $16,000 for the cost of doing the work of building the appropriate deck by the second method. Steel, on cross-examination, admitted that it was possible to build the deck other than by the second method developed by him. This, so Steel testified, would be accomplished by using columns at the edges of the deck which would cost about the same amount and would destroy the existing deck attached to unit #1 or largely nullify use of that deck by the occupant of that unit. Seuss also conceded it would have been possible to build a deck on unit #2.

About June 22, 1984, so the judge found, the owners (through their broker) informed the buyer that they would not sell unit #2 with a deck for $80,000, but would do so

"with a fire escape alone for $80,000 or, alternatively, return the" buyer's deposit (with interest) to her. The buyer rejected this offer. This was later confirmed by a telephone call from Seuss to the buyer and a letter. The judge ruled, after receiving the jury's answers to special questions (note 6, *infra*), that the owners had committed a breach of the agreement by repudiating the April agreement in advance of the time set for performance and by failing to appear at the proposed closing on June 29. The buyer was then ready to perform the agreement as the judge construed its terms. The seller by then had not built a deck.

Throughout the trial, the owners' counsel attempted to persuade the judge that the third rider (see note 3, *supra*) constituted only a condition precedent to the buyer's obligation to perform the April agreement rather than a promise by the owners to provide a deck. For example, the owners' counsel tried to prove that during the negotiations the owners' counsel had objected to a suggestion by the buyer's attorney to insert in the April agreement an explicit undertaking by the owners to proceed with installation of a deck. The judge excluded the evidence on the ground that what remained in the agreement was not ambiguous and that the offered evidence would not be received under the parol evidence rule. There also were rulings of the judge on cost estimates (out of the presence of the jury) where there was discussion of the provisions of the April agreement set out in the appendix, *infra*. At a bench conference when the buyer rested her case, the owners' trial counsel moved for dismissal of the buyer's complaint essentially on the ground that the owners were entitled to such a dismissal by virtue of the provisions of the April agreement quoted in the appendix to this memorandum and order, *infra*. The motion was denied. The most explicit request for a different view of the third rider (note 3, *supra*) came after the judge's charge, when he was about to submit the case to the jury on special questions.[5]

---

[5] The judge gave counsel opportunity to comment on his charge. He had charged, in effect, that the third rider was an absolute agreement by the

The jury returned with the answers to the special questions on July 10, 1986, summarized in the margin.[6] The judge heard arguments on July 11, 1986, at a posttrial hearing to determine what relief should be ordered on the basis of the jury's answers to special questions. The judge also had retained jurisdiction in himself to determine whether specific performance should be required from the sellers. On August 15, 1986, he filed findings, rulings, and an order for judgment. Final judgment was entered on October 30, 1986. The owners appealed.

The judgment ordered that specific performance be afforded to the buyer upon her payment of $80,000, less a $5,000 deduction for failure of the owners to include a deck (instead of merely a fire escape). This would result in a "net purchase price of $75,000," with $3,000 of the $5,000 deduction to be held as an escrow sum for building a fire escape in the manner stated in detail in the judgment. The issues before us on this appeal concern par. 3 of the rider (quoted in note 3, *supra*)

---

owners to erect the deck next to unit #2. The owners' counsel asked for an instruction that "the jury should consider . . . certain provisions of the parties' agreement . . . which would deal with what would happen if the . . . [owners were] unable to perform." To this the judge merely replied that "the agreement itself is in evidence and they are to read it." The owners' counsel (after referring to his earlier efforts to prove that the April agreement imposed no obligation upon the owners to build the deck) asked for an "instruction that . . . the good faith and reasonable efforts of the . . . [owners] should be considered in determining whether their obligations under the agreement were discharged." When the judge replied, "No; I won't give that," the owners' counsel then said, "I just wanted to state it for the record — including such matters as the structural problems they encountered, the problems with the neighbor, the issues of the time and the issues of cost, and I would ask for a special verdict question on those issues as well." The judge refused the request.

[6] The answers to the special questions were as follows: (1) that there was an agreement for the sale of unit #2, (2) that the buyer was ready, willing, and able to perform it on May 30, 1985, (3) that the owners were not then ready and able to perform, (4) that the parties by their agreement or conduct extended the closing date to June 29, (5) that notice of a closing at 10 A.M. on the 29th was given; (6) that the buyer was then ready, able, and willing to perform, but (7) the owners were not, (8) that the buyer did not break the agreement, but (9) the owners did, (10) that the owners repudiated the agreement, in advance of the time set for performances, (11) that the fair market value of unit #2 on May 30, 1984, was $82,000, and (12) on June 29, 1984, was $82,225.

and the so-called "termination" and related provisions of the April agreement set out in the appendix to this opinion.

1. The sellers' first contention on this appeal is that the judge erred in interpreting par. 3 of the rider attached to the April agreement as a *promise* by the sellers to furnish a deck rather than as merely providing a *condition precedent* to the buyer's obligation to perform under the agreement. Such a ruling was implicit in the judge's exclusion of evidence of the sellers' refusal (during negotiations) to agree specifically to produce a deck.

The "termination clause" and related provisions of the type set out in pars. 10-12 of the April agreement (see appendix) long have been a source of controversy and litigation. See the cases discussed in Park & Park, Real Estate Law §§ 953-957 (2d ed. 1981 & Supp. 1985). It seems to be generally agreed by the commentators on the standard forms that no obligation is imposed upon, and no promise is made by, a seller of land by a provision that is expressed as making a buyer's obligation to perform under a purchase agreement "subject to" the occurrence of a particular event.[7] Such a provision is referred to as imposing no duty on the seller to cause the event to occur except in circumstances not present in the instant case. See the Park treatise § 955, at 404-405; Hughes, Contracts and Agency § 4.2 at 47, in 1958 Ann. Survey Mass. Law (1959); Lapatin, (Greater Boston Real Estate Board) Standard Forms Guide 8-10, 29, 47-48 (1986). See also the discussion in Mendler, Massachusetts Conveyancers' Handbook §§ 1:15-1:18 (3d ed. 1984).

The views of the commentators are based largely on principles announced in decisions concerning defects of title. The

---

[7] The owners in their brief point out that the provisions (other than par. 3 as quoted in note 3, *supra*) of (or incorporated by reference in) the rider attached to the April agreement show a clear distinction between pars. 2, 3, and 4 of that rider which by their terms impose no obligation on the sellers to do anything, and par. 7, where the sellers "warrant" that "there is ample electrical service for washer and drier." If any *obligation* to build a deck was to be placed on the sellers, it would have been natural to have done it by a clear promise or warranty by the sellers instead of by a condition precedent to the buyer's duty to purchase.

principal decision was *Old Colony Trust Co.* v. *Chauncey*, 214 Mass. 271, 273 (1913), which held, under a provision (like that in the case at bar), "if it turns out that without fault . . . of the defendants [sellers] subsequent to the execution of the [purchase] contract, they have a defective title, then, after refunding payments made, all obligations of both parties shall cease." That case has been followed in other cases where the seller had not expressly or implicitly bound himself to see that a condition was performed. See, e.g., *Connor* v. *Rockwood*, 320 Mass. 360, 361-362 (1946); *Livoli* v. *Stoneman*, 332 Mass. 473, 475-476 (1955); *Barrett* v. *Carney*, 337 Mass. 466, 467-468 (1958).

The cases just cited were reviewed in *Sawl* v. *Kwiatkowski*, 349 Mass. 712, 714-716 (1965), where an inheritance tax lien was found to exist without the knowledge of the vendor of a parcel of real estate at the time the agreement for its sale was executed, with the consequence that it was held that (under a provision like par. 10 in the present case) there was no obligation upon the vendor to remove the lien. See the similar review of the earlier cases in *Durkin* v. *Ferreira*, 21 Mass. App. Ct. 771, 773-776 (1986), where, because the then seller knew of the liens before signing the purchase agreement, he had not been acting in good faith and could not invoke a termination provision essentially like par. 10.[8]

2. The decisions just cited have been affected to some extent by another group of cases. In these later decisions, by reason of particular language in the purchase agreement or some attendant circumstances, an obligation of a party to such an agreement has been implied to make reasonable efforts to satisfy the condition. Such affirmative efforts may involve reasonable attempts to obtain the approval of a third person (or a committee or board) for some proposed use of the land covered by the agreement or to remove a defect in its title and, we think also,

---

[8] In the present case, the trial judge directed the jury that "[t]here is no evidence of bad faith on the part of any one" and ruled that both the owners and the buyer "acted in good faith in the transaction." We have been referred to no evidence which would show this finding to be unsupported or which would cause this ruling to be clearly erroneous.

to make the premises conform physically with the description mentioned in the condition. See, e.g., *Widebeck* v. *Sullivan*, 327 Mass. 429, 432-433 (1951); *Stabile* v. *McCarthy*, 336 Mass. 399, 402-406 (1957); *Sechrest* v. *Safiol*, 383 Mass. 568, 570-572, and see n.5 (1981), disapproving the suggestion in the *Connor* case, 320 Mass. at 361-362.[9]

We conclude that the trial judge erred in ruling that the language of par. 3 of the rider (see note 3, *supra*) imposed any obligation on the sellers to provide a deck in the absence of a ruling by him that, in the circumstances, an obligation to use reasonable efforts to do so should be implied. Thus he should have ruled in an explicit manner whether, under par. 3, the sellers undertook any obligation whatsoever to build a deck, and (if in doubt) should have received the parol evidence excluded by him. If the judge thought, despite the form of par. 3 of the rider, that there was an implied duty on the sellers to use reasonable efforts to build the deck, he (as in effect requested by the sellers) should have framed a special question for the jury appropriate to present the issue (whether they had done so) for the jury's determination.

Cases like *Stabile* v. *McCarthy*, 336 Mass. at 402-404, *Sechrest* v. *Safiol*, 383 Mass. at 571, and *Lynch* v. *Andrew*, 20 Mass. App. Ct. 623, 626 (1985), require "to trigger a contingency in . . . [a purchase] agreement" only affirmative "conduct reasonably calculated to fulfill the condition by action or expenditure proportionate to the circumstances." *Ibid.* See the standard mentioned in the *Stabile* case at 404, that a party, "in order to show that he has done enough to meet the condition precedent to his right to cancel, need prove not absolute impossibility, but merely activity reasonably calculated to obtain the

---

[9] It is argued by the buyer that provisions like pars. 10-11 of the April agreement have reference only to defects in *title*. Such an interpretation is in conflict with the words "if at the time of delivery of the deed the premises do not conform with the provisions hereof" following the bracketed letter [U] in par. 10, and the similar words in the emphasized passage following the bracketed letter [V] in par. 10, each in the appendix, *infra*. See also as to par. 11, the emphasized language following the bracketed [Y] in par. 12, as reproduced in the appendix.

approval [or to satisfy any obligation properly implied in the condition] by action or expenditure not disproportionate in the circumstances."

We would be inclined to rule, on this record, particularly in the light of the judge's instruction that there was no bad faith by the sellers (see note 8, *supra*), that, under rider 3, the sellers made no promise and assumed no obligation to build the deck. We recognize, however, that cases like *Sechrest* v. *Safiol*, 383 Mass. at 570-571, in some circumstances, seem to require (even where no obligation on a party to a purchase agreement to bring about the performance of a condition pre-cedent is apparent from the terms of the condition) that the party show that he has in good faith used reasonable efforts to bring about that performance.

We conclude that the judge (on the issue of whether the seller had used reasonable efforts) should have instructed the jury on the factors which they appropriately should have considered, including at least (1) whether the buyer's acceptance and knowledge of the condominium papers (see note 2, *supra*) in any manner barred her from relief; (2) whether and to what extent obtaining the efforts of Steel, the architect, constituted (with other affirmative action taken by the owners and all other circumstances) reasonable efforts; (3) whether the owners (in all the circumstances) were required to construct the deck next to unit #2 in view of its possible effect upon their own units and their own decks, and (4) whether the cost of producing a deck (added to its other detrimental consequences) was more than what was required by the standard set in the *Stabile* case, 336 Mass. at 403-405.[10] Some of these issues may involve questions of law properly for the judge at a new trial, but (until the factual issues listed above have been resolved) it now would be premature to consider them.

*Judgment reversed.*

---

[10] If the cost was as much or more than what was required, an additional question of law will arise, of course, whether the tender by the sellers (rejected by the buyer) of performance by them, substantially in accordance with par. 12 of the April agreement, in the circumstances, should bar the buyer from other relief.

McCarthy *v.* Mills.

APPENDIX.

The April agreement of purchase and sale in pars. 9 through 12 reads as follows (all emphasis supplied):

"9. POSSESSION and CONDITION of PREMISES.
(attach a list of exceptions, if any)

Full possession of said premises free of all tenants and occupants, except as herein provided, is to be delivered at the time of the delivery of the deed, said premises to be then (a) in the same condition as they now are, reasonable use and wear thereof excepted, and (b) not in violation of said building and zoning laws, and (c) in compliance with the provisions of any instrument referred to in clause 4 hereof. The BUYER shall be entitled to an inspection of the Unit prior to the delivery of the deed in order to determine whether the condition thereof complies with the terms of this clause.

"10. EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM.
(Change period of time if desired)

If the SELLER shall be unable to give title or to make conveyance, or [U] *to deliver possession of the premises, all as herein stipulated, or if at the time of the delivery of the deed the premises do not conform with the provisions hereof*, then any payments made under this agreement shall be refunded and all other obligations of the parties hereto shall cease and this agreement shall be void and without recourse to the parties hereto, [V] *unless the SELLER elects to use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said premises conform to the provisions hereof*, as the case may be, in which event the SELLER shall give written notice thereof to the BUYER at or before the time for performance hereunder, and thereupon the time for performance hereof shall be extended for a period of thirty days.

"11.  FAILURE TO
       PERFECT TITLE OR
       MAKE PREMISES
       CONFORM, etc.

If at the expiration of the extended time the SELLER shall have failed so to remove any defects in title, deliver possession, [W] *or make the premises conform, as the case may be, all as herein agreed*, or if at any time during the period of this agreement or any extension thereof, the organization of unit owners shall fail to agree, within the time period set forth in the Act, if applicable, to proceed with such repair or restoration as may be necessary for such purposes, or shall expressly agree not to so proceed, or the holder of a mortgage on the unit shall refuse to permit any insurance proceeds to be used for such purpose, then at the BUYER's option, any payments made under this agreement shall be forthwith refunded and all other obligations of all parties hereto shall cease and this agreement shall be void without recourse to the parties hereto.

"12.  BUYER'S
       ELECTION TO
       ACCEPT TITLE

The BUYER shall have the election, [X] *at either the original or any extended time for performance*, to accept such title as the SELLER can deliver [Y] *to the said premises in their then condition* and [Z] *to pay therefor the purchase price without deduction*, in which case the SELLER shall convey such title, except that in the event of such conveyance in accord with the provisions of this clause, if the said premises shall have been damaged by fire or casualty insured against by the organization of unit owners or by the SELLER, then the SELLER shall, on delivery of the deed, unless said premises have previously been restored to their former condition, pay over or assign to the BUYER all amounts recovered or recoverable by the SELLER on account of

such insurance, and give the
BUYER a credit against the purchase
price equal to any amounts otherwise
so recoverable which are retained
by the holder of a mortgage on the
Unit, less any amounts reasonably
expended by the SELLER for any
partial restoration."

The letters in brackets have been inserted for convenient reference to the emphasized language immediately following such letters, respectively.