THOMAS J. HASTINGS *vs.* EBENEZER R. GAY & another.[1]

No. 00-P-60.

Plymouth. April 8, 2002. - June 12, 2002.

Present: RAPOZA, MASON, & GRASSO, JJ.

*Real Property,* Purchase and sale agreement, Certificate of title, Conveyance, Specific performance. *Mortgage,* Discharge. *Contract,* Specific performance, Performance and breach.

In a civil action brought by a prospective buyer of real property to enforce a purchase and sale agreement, where the sellers failed to present any probative evidence that, through no fault of their own, they were in fact unable to deliver good and clear record and marketable title as required by the agreement, or that they had properly invoked a clause in the agreement that would render the agreement void in the event that the sellers were unable to convey title in accordance with the agreement, the judge properly determined that the sellers had breached the agreement by failing to deliver such title. [161-164]

In a civil action brought by a prospective buyer of real property to enforce a purchase and sale agreement, there was no genuine dispute with respect to the buyer's ability to proceed with the purchase which would preclude an award of summary judgment in his favor. [164-165]

CIVIL ACTION commenced in the Superior Court Department on October 9, 1997.

The case was heard by *Charles F. Barrett,* J., on motions for summary judgment.

*Douglas W. Salvesen* for the defendants.

*Bruce A. Issadore* for the plaintiff.

MASON, J. The plaintiff (buyer) obtained a judgment in the Superior Court ordering the defendants (sellers) to convey to him good and clear record and marketable title to a residential property located at 89 North Street in Hingham (property) in accordance with the May 13, 1997, purchase and sale agreement

---

[1]Winifred Gay.

between the parties. On appeal, the sellers claim that they should have been excused from performing their obligations under the agreement because the agreement stated that it would be void in the event that the sellers were unable to convey a good and clear record and marketable title to the property and they were, in fact, unable to convey such a title. The sellers further claim that the buyer himself was not ready, willing, and able to pay the agreed upon purchase price for the property at the time set for the closing and, hence, the buyer was barred from enforcing the agreement. We affirm the judgment.

*Background.* The pleadings, affidavits and other materials before the judge showed the following undisputed facts. On May 13, 1997, the parties entered into a standard form purchase and sale agreement published by the Greater Boston Real Estate Board (agreement) for the sale of the property which was owned by the sellers. Paragraph 4 of the agreement provided that the deed "shall convey a good and clear record and marketable title [to the property] free from encumbrances . . . ." Paragraph 8 provided that the closing would take place at 12:00 noon on August 29, 1997, at the Plymouth County Registry of Deeds and specified that "time is of the essence of this agreement."

Paragraph 10 of the agreement provided, however, that the agreement would be void in the event that the sellers were unable to convey title in accordance with the provisions of the agreement, unless the sellers elected to use reasonable efforts to remove any defects in the title, in which event the time of the closing would be extended for thirty days. More specifically, paragraph 10 provided:

> "If the SELLER shall be unable to give title or to make conveyance . . . as herein stipulated, . . . then any payments made under this agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this agreement shall be void without recourse to the parties hereto, unless the SELLER elects to use reasonable efforts to remove any defects in title . . . in which event the SELLER shall give written notice thereof to the BUYER at or before the time for performance hereunder, and thereupon the time for performance hereof shall be extended for a period of thirty (30) days.

Paragraph 12 of the agreement provided that the buyer would have the option, either at the original or any extended time for performance, to accept such title as the sellers could deliver. More specifically, paragraph 12 stated:

> "The BUYER shall have the election, at either the original or any extended time for performance, to accept such title as the SELLER can deliver . . . and to pay therefore the purchase price without deduction, in which case the SELLER shall convey such title . . . ."

The buyer gave the seller a deposit of $12,000 pursuant to the agreement. Subsequently, on or about August 20, 1997, the buyer inquired through the broker whether the sellers might be willing to postpone the closing for two weeks. On August 25, 1997, counsel for the sellers sent a letter to counsel for the buyer stating that the sellers would not consider postponing the closing date.

Shortly thereafter, on August 28, 1997, counsel for the buyer faxed to counsel for the sellers a letter stating that he had just received a title report on the property and had discovered that there were three separate defects in the title. The defects included an outstanding lease dated September 23, 1939, pertaining to a portion of the property, a sewer assessment dated May 24, 1958, and an outstanding mortgage dated December 3, 1993, to the parents of one of the sellers. The letter stated: "These items obviously need to be resolved before the closing. Please let me know where you are on taking care of these title matters."

Later that same day, counsel for the sellers faxed a response to counsel for the buyer stating that he did not agree that the items counsel had cited constituted defects which would prevent the sellers from delivering "a good and clear record and marketable title." The letter further stated that the 1939 lease was terminable at any time, and that the 1958 assessment had been paid and a release could be obtained. The letter also stated that counsel was in the process of obtaining a discharge from the holders of the 1993 mortgage who were, in fact, his clients and had authorized him to release the discharge as soon as payment had been received. Finally, the letter stated that:

"I have also had my clients sign a Deed and a Power of Attorney for the closing. We are prepared to deliver those tomorrow, August 29, 1997. I will await your response as to whether a closing will take place. If not, we will assume that your client will default."

On the morning of August 29, counsel for the buyer faxed a further letter to counsel for the seller stating that he did not regard the title defects he had identified as trivial and that "[m]y client intends . . . to require your client to deliver good and clear record title." Counsel for the sellers promptly faxed a response stating that his client was "willing to provide a letter of termination to his neighbor concerning the termination of the lease," and that the broker was securing a release of the 1958 sewer assessment which "will be available for a closing today." The letter further stated that counsel was still in the process of obtaining a discharge of the mortgage: "I again propose that I will hold the entire net proceeds from the sale of [the] property until this discharge has been secured and recorded." Finally, the letter stated: "My client has directed me to be present at 12:00 noon in the Plymouth Registry of Deeds with the broker and prepare to close. Please give me the courtesy of advising whether your client will do the same."

Thereafter, the sellers and their counsel did appear at the Plymouth Registry of Deeds for the closing, but the buyer and his counsel did not. Although they appeared at the closing, neither the sellers nor their counsel had in their possession any discharge of the 1993 mortgage or termination of the 1939 lease.

Four days later, on September 2, 1997, counsel for the sellers sent counsel for the buyer a letter stating that:

"[W]e consider you to be in default of [the agreement]. This default occurred on Friday afternoon, August 29, 1997, when the Seller was present to deliver a deed and requisite documents to complete the conveyance of the above-described property. As a result of this default, we are formally advising you that we are retaining any and all deposits as liquidated damages in accordance with Article 21 of the Purchase and Sale Agreement. We consider this Agreement totally null and void and wish to

advise you that the property will be immediately put back on the market."

Notwithstanding this letter, counsel for the buyer appeared at the Plymouth Registry of Deeds on September 29, 1997, prepared to close on the purchase of the property. This time, however, neither the sellers nor their counsel appeared.

The buyer subsequently commenced the present action in Superior Court requesting specific performance of the contract or, alternatively, damages for breach of contract and breach of the implied duty of good faith and fair dealing. The sellers filed an answer and a counterclaim seeking a determination that the buyer himself had breached the agreement and, hence, they were entitled to retain the buyer's deposit as liquidated damages.

After the buyer filed a motion for partial summary judgment on the issue of liability on all counts and the sellers filed a cross-motion for summary judgment, a judge of the Superior Court found that the sellers had committed a breach of the agreement and had acted in bad faith by failing to obtain a discharge of the mortgage prior to the date set for the closing and to deliver a good and clear title to the property. Final judgment for the buyer ordered the sellers to clear any defects in title and to convey good and clear record and marketable title to the buyer.[2]

1. *Sellers' breach of agreement.* The sellers claim that the judge erred in finding that they had committed a breach of the agreement and had acted in bad faith by failing to obtain a discharge of the mortgage and deliver a good and clear title to the property because, under paragraph 10, the agreement automatically became void in the event they were unable to deliver such a title. The sellers also claim that they were unable to deliver such a title not only because of the outstanding mortgage, but also because of the lease and sewer assessment which they had not known about until shortly before the closing was scheduled to occur.

It is settled that an escape clause of the type involved in this case "does not require affirmative action by a seller to cure a

[2]On May 8, 2000, through the auspices of this court's conference program, the buyer waived all damage claims against the sellers except claims for specific performance, declaratory and injunctive relief.

title defect if the seller was not aware of the defect when the agreement was executed." *Sachs* v. *Hirshom*, 16 Mass. App. Ct. 704, 705 (1983), citing *Sawl* v. *Kwiatowski*, 349 Mass. 712, 714-716 (1965). On the other hand, such a clause will not apply to void an agreement where the seller's inability to convey good and clear title was the result of his own fault or collusion. See *Durkin* v. *Ferreira*, 21 Mass. App. Ct. 771, 773-774 (1986), citing *Old Colony Trust Co.* v. *Chauncey*, 214 Mass. 271, 273 (1913).

For example, in *Lafond* v. *Frame*, 327 Mass. 364 (1951), the Supreme Judicial Court held that, under a provision similar to the one involved in this case, a seller was not relieved of her obligation to comply with an agreement for the sale of certain real estate she owned by her failure to obtain a discharge of a mortgage she had previously given to a bank. After noting that "[t]he clause is no protection to an owner who is not acting in good faith and does not intend to carry out the agreement," *id.* at 867, the court stated:

> "The existence of the mortgage was known to the seller who was herself the mortgagor. She made no attempt to show financial inability to discharge it or any changed circumstances arising after the execution of the contract of sale. In these circumstances the judge justifiably found that the defendant did not sell merely because she did not wish to do so." *Id.* at 368.

Here, just as in *Lafond*, the sellers were themselves the mortgagors and, hence, knew about the mortgage. They also made no attempt to show any financial inability to discharge the mortgage or changed circumstances occurring after the contract of sale. In these circumstances, the judge was warranted in finding that the sellers had acted in bad faith in failing to obtain a discharge of the mortgage and, hence, the existence of the mortgage could not by itself entitle the sellers to rely on paragraph 10.[3] See *ibid.* See also *Rousseau* v. *Mesite*, 355 Mass. 567, 571-572 (1969).

---

[3]We reject the sellers' claim that, in finding that they had acted in bad faith in failing to obtain a discharge of the mortgage, the judge impermissibly resolved a disputed factual issue against them. In view of the sellers' failure to present any evidence of financial inability or changed circumstances, there

Moreover, at the time the events were occurring, the sellers themselves insisted that they could provide a termination of the lease and a release of the sewer assessment, which had been paid, on the date originally set for the closing. They made no contrary contention in the Superior Court. We, therefore, reject the sellers' claim that these additional defects could have rendered the agreement void under paragraph 10. See *Sachs* v. *Hirshom*, 16 Mass. App. Ct. at 707. As the sellers themselves recognized, the additional defects were purely technical in nature and could have been removed at any time by the sellers' performance of the minimal acts they had outlined.[4]

We further note that, in order to invoke the benefit of paragraph 10, the sellers were first required to afford the buyer the opportunity provided by paragraph 12 to accept such title as they could deliver either at the original or at the extended date set for performance, which was, at a minimum, a title absent the easily curable mortgage defect. Then, if the buyer rejected this option, they were required to return the buyer's deposit. Rather than take either of these actions, however, the sellers purported to place the buyer in default for failing to proceed with the original closing even though they themselves were not ready to proceed at such closing and even though the buyer was not obliged to perform by reason of the uncured defects. This action was improper. See *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. 509, 519-520 (1998), cert. denied, 525 U.S. 1177 (1999) ("when performance under a contract is concurrent, one party cannot put the other party in default unless he is ready, able, and willing to perform"). It also constituted a waiver by the sellers of any right they might have

was no genuine dispute as to this issue. See Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). See *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 477 (2001).

[4]At oral argument, counsel for the sellers asserted for the first time, contrary to the sellers' position at the time the events were occurring, that the outstanding lease could not be terminated at any time upon written notice, but only upon notice of termination which would not become effective until the conclusion of the current one-year term. In fact, the lease provided that it could be terminated "at any time at the option of the Lessor upon written notice mailed to the Lessee." Nowhere did it provide that the lease term would continue after the giving of such notice.

had to rely on paragraph 10.[5] See *J.J. Newberry Co.* v. *Shannon*, 268 Mass. 116, 118 (1929). See also *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. 686, 695 (1996) (in order to rely on contractual provision, party must comply with its conditions).

We, therefore, conclude that the judge properly determined that paragraph 10 was inapplicable and that the sellers breached the agreement by failing to deliver good and clear record and marketable title as required by the agreement. The sellers failed to present any probative evidence that, through no fault of their own, they were in fact unable to deliver such title or that they had properly invoked paragraph 10. See *Durkin* v. *Ferreira*, 21 Mass. App. Ct. at 775-776.

2. *Buyer's ability to pay the purchase price.* The sellers claim that there was evidence that the buyer himself was not ready, willing and able to pay the agreed upon purchase price for the property on the original or subsequent closing date and, hence, should have been precluded from enforcing the agreement. See *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. at 519-520. The sellers point specifically to the evidence that the buyer had requested an extension of the original closing date on or about August 20, 1997, and that his counsel failed to notify them of the title defects until one day before the closing was scheduled to occur. They also point to certain testimony the buyer gave at the deposition shortly before the scheduled clos-

---

[5]The sellers have suggested that it is irrelevant that they neither gave the buyer an opportunity to take title to the property subject only to the lease or assessment nor returned the deposit, because, on the date initially set for the closing (August 29, 1997), their counsel telephoned counsel for the buyer and left a message that the sellers would be willing to return the deposit, and because the buyer subsequently testified at a deposition that he would not have been willing to take title to the property if the lease and assessment were still outstanding. The sellers offered no evidence, however, that counsel for the buyer had even received their message about being willing to return the deposit, let alone had rejected it, before they sent their letter of September 2, 1997, stating that they considered the buyer in default and would, therefore, retain the deposit. Moreover, the buyer's deposition testimony was hypothetical only and could not excuse the sellers' failure at the time the events were occurring actually to offer the buyer an opportunity to accept title to the property subject only to the lease and assessment and not the outstanding mortgage.

ing that he still had not decided how he would pay for the property.

In fact, the buyer presented admissible, probative evidence in the form of his own deposition testimony that he had sufficient funds available in his various bank accounts to pay cash for the property, or alternatively, that he had sources available from which he readily could have borrowed the available funds. The sellers presented no probative evidence to the contrary and, indeed, did not even contend in the Superior Court that the buyer was not ready, willing, and able to proceed with the purchase either at the date originally set for the closing or thirty days thereafter. On this record, there was no genuine dispute with respect to the buyer's ability to proceed with the purchase which precluded an award of summary judgment in his favor. See *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 477 (2001).

*Judgment affirmed.*